EDUARDO HUERTAS ALICEA ET AL., demandantes y recurridos, v. COMPAÑÍA DE FOMENTO RECREATIVO ET AL., demandados y peticionarios.

*Número:* CC-96-425          *Resuelto:* 4 de noviembre de 1998

*Sixto Pabón García,* abogado de los peticionarios; *Eliezer Aldarondo Ortiz, Isabel López Brás, Claudio Aliff Ortiz* y *Antonio Adrover Robles,* de *Aldarondo & López Brás,* abogados de los recurridos.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

Nos corresponde resolver si la Compañía de Fomento Recreativo es una agencia o instrumentalidad del Gobierno de Puerto Rico que opera como un negocio o empresa privada, según establecido en la definición de *patrono* del Art.

5 de la Ley Núm. 100 de 30 de junio de 1959 (29 L.P.R.A. sec. 150), la cual prohíbe el discrimen en el empleo por razón de edad, raza, color, sexo, matrimonio, origen social o nacional, condición social, ideas políticas o religiosas. 29 L.P.R.A. secs. 146 y 151.

Por entender que la Compañía de Fomento Recreativo es una agencia o instrumentalidad del Gobierno que opera como un negocio o empresa privada, revocamos la sentencia del Tribunal de Circuito de Apelaciones. Confirmamos la conclusión del Tribunal de Primera Instancia de que el traslado del Sr. Eduardo Huertas Alicea fue discriminatorio y ordenamos su reposición como Administrador del Balneario Punta Guilarte.

## I

Eduardo Huertas Alicea comenzó a trabajar en la Compañía de Fomento Recreativo (en adelante la Compañía) el 18 de febrero de 1992 como empleado transitorio. En agosto de ese mismo año fue nombrado Funcionario Ejecutivo III en una posición de carrera con clasificación regular, en la que fungía como Administrador del Balneario Punta Guilarte en Arroyo. El 1ro de marzo de 1993 la entonces Presidenta y Gerente General de la Compañía, Sra. Marimer Olazagasti, le remitió una carta informándole que sería trasladado a la Oficina Regional del Departamento de Recreación y Deportes (en adelante el Departamento) en Guayama. Dicho traslado no conllevaba cambio de sueldo ni de clasificación.

Inconforme con el traslado, el señor Huertas Alicea presentó un recurso ante el Comité de Apelaciones de la Compañía. Al no ser acogida la apelación, instó una demanda contra la Compañía y la Sra. Marimer Olazagasti en su carácter personal y como Administradora de la Compañía, ante el Tribunal de Primera Instancia. Alegó que el traslado obedecía a razones políticas, ya que él era afiliado

del Partido Popular Democrático, incluso había sido candidato a alcalde en las primarias del Partido Popular en Arroyo. La Compañía negó que en el traslado mediaran consideraciones discriminatorias y alegó que el traslado obedecía a necesidades de servicio y reorganización.

Estando pendientes los procedimientos en dicho tribunal, el Gobernador de Puerto Rico, Hon. Pedro Rosselló González, mediante la Orden Ejecutiva Núm. DE-1995-10 de 26 de enero de 1995, ordenó la reubicación de los empleados de la Compañía y el Departamento a las dependencias de sus respectivas agencias, eliminando la práctica hasta entonces vigente de entremezclar empleados de ambas agencias en las distintas dependencias. El 15 de febrero de 1995 se le informó al señor Huertas Alicea que de acuerdo con lo pautado en la referida orden ejecutiva, era trasladado nuevamente al Balneario de Punta Guilarte.

El señor Huertas Alicea impugnó este nuevo traslado por considerar que no lo colocaba en las mismas condiciones de empleo que antes tenía, ya que siendo él un Funcionario Ejecutivo III, quedaba bajo la supervisión del señor Conde Navarro, Funcionario Ejecutivo II. A petición del señor Huertas Alicea, el Tribunal de Primera Instancia emitió una resolución y orden mediante la cual paralizó el nuevo traslado al balneario en Arroyo.

Celebrado el juicio en sus méritos, el Tribunal de Primera Instancia falló a favor del señor Huertas Alicea. Determinó que la Compañía es una instrumentalidad gubernamental que funciona como empresa o negocio privado, por lo cual está comprendida en la definición de *patrono* de la Ley Núm. 100, *supra*, 29 L.P.R.A. secs. 146 y 151. Aplicó también la presunción de discrimen por afiliación política de la Ley Núm. 382 de 11 de mayo de 1950[1] (29 L.P.R.A.

---

[1] Se presumirá que cualquiera de los actos mencionados en la sección precedente obedece a que el empleado o ex empleado está afiliado a determinado partido político cuando el patrono haya realizado el acto sin justa causa, o dentro de tres (3) meses antes o seis (6) meses después de haberse celebrado cualquier elección política en PuertoRico. Esta presunción será de carácter controvertible. 29 L.P.R.A. sec. 137.

ants. secs. 136–139) al determinar que la carta de traslado fue remitida al señor Huertas Alicea el 1ro de marzo. de 1993, aproximadamente cuatro (4) meses después de la celebración de las elecciones generales en Puerto Rico.

Dicho tribunal consideró que la Compañía no controvirtió la presunción de discrimen de la Ley Núm. 382, *supra*, y estimó que la prueba presentada demostraba que el señor Huertas Alicea ocupaba una posición prominente en el Partido Popular Democrático. Concluyó que el traslado obedeció a la afiliación política del señor Huertas Alicea y que tal traslado había sido discriminatorio, arbitrario e innecesario. Estimó los daños en diez mil dólares ($10,000), cantidad a la cual se aplicaría la penalidad de la doble compensación que procedía de acuerdo con el Art. 1 de la Ley Núm. 382, *supra*, 29 L.P.R.A. sec. 136, y el Art. 1 de la Ley Núm. 100, *supra*, 29 L.P.R.A. sec. 146. Ordenó también la reposición del señor Huertas Alicea a la posición de Administrador del Balneario Punta Guilarte, con todas las funciones y prerrogativas correspondientes al cargo que ocupaba antes del traslado.

Inconforme con este dictamen, la Compañía acudió al Tribunal de Circuito de Apelaciones, Circuito Regional VI de Caguas, Humacao y Guayama, el cual revocó la sentencia emitida por el tribunal de instancia. Determinó que para la fecha en que se le remitió al señor Huertas Alicea la carta del traslado, la Compañía no era una instrumentalidad pública que operaba como negocio o empresa privada, por lo cual no le aplicaban las disposiciones y remedios de la Ley Núm. 382, *supra*, y de la Ley Núm. 100, *supra*. Determinó que la Compañía estaba sujeta en ese momento al control administrativo del Administrador de Parques y Recreos Públicos, y que carecía de autonomía fiscal y presupuestaria.

## II

■ La Ley Núm. 100, *supra*, según enmendada, 29 L.P.R.A. sec. 146 *et seq.*, y la Ley Núm. 382, *supra*, 29 L.P.R.A. sec. 136 *et seq.*, prohíben el discrimen en el empleo por ideas políticas o por afiliación a un partido político. En *Cardona v. Depto. Recreación y Deportes*, 129 D.P.R. 557 (1991), resolvimos que por tratarse de leyes *in pari materia*, sus disposiciones han de interpretarse armoniosamente. Tanto la Ley Núm. 382, *supra*, como la Ley Núm. 100, *supra*, definen lo que constituye un *patrono* a los fines de ese ordenamiento. En ambos casos el término patrono *"incluye a toda persona natural o jurídica que emplee obreros, trabajadores o empleados, y al jefe, funcionario, gerente, oficial, gestor, administrador, superintendente, capataz, mayordomo, agente o representante de dicha persona natural o jurídica"*. (Énfasis suplido.) 29 L.P.R.A. secs. 139 y 151. Sin embargo, la Ley Núm. 100, *supra*, expresamente incluye en la definición *"aquellas agencias o instrumentalidades del Gobierno de Puerto Rico que operen como negocios o empresas privadas."*[2] (Énfasis suplido.) 29 L.P.R.A. sec. 151.

■ A los fines de lograr una interpretación armoniosa de ambos estatutos y de evitar un conflicto en cuanto a quién constituye patrono bajo estas dos (2) leyes, determinamos en *Cardona v. Depto. Recreación y Deportes*, supra, que la definición de patrono incluida en la Ley Núm. 100, *supra*, ley posterior, debe prevalecer sobre la de la Ley

---

[2] Art. 6(2) de la Ley Núm. 100 de 30 de junio de 1956 (29 L.P.R.A. sec. 151(2)).

Debemos recalcar que el criterio de *"agencias o instrumentalidades del Gobierno de Puerto Rico que operen como negocios o empresas privadas"* se repite en varios estatutos y en nuestra Constitución: Art. II, Secs. 17 y 18, Const. E.L.A., L.P.R.A., Tomo 1; Art. 2(29) y (11) de la Ley de Relaciones del Trabajo de Puerto Rico, Ley Núm. 130 de 8 de mayo de 1945 (29 L.P.R.A. sec. 63(2) y (11)); Sec. 33 de la Ley de Salario Mínimo de Puerto Rico, Ley Núm. 96 de 26 de junio de 1956 (29 L.P.R.A. ant. sec. 246e(a)(1)); Sec. 2 de la Ley de Seguridad de Empleo de Puerto Rico, Ley Núm. 74 de 21 de junio de 1956, según enmendada por el Art. 1 de la Ley Núm. 85 de 24 de junio de 1971 (29 L.P.R.A. sec. 702(j)).

Núm. 382, *supra*, ley anterior. Ambos estatutos aplicarán en aquellos casos en que el patrono gubernamental querellado sea una agencia o instrumentalidad del Gobierno que opere como negocio o empresa privada.

La Ley Núm. 100, *supra*, no define los términos "negocio" o "empresa privada". Para determinar qué significa *"aquellas agencias o instrumentalidades del Gobierno de Puerto Rico que operen como negocios o empresas privadas"*, 29 L.P.R.A. sec. 151(2), al amparo de la Ley Núm. 100, *supra*, y de la Ley Núm. 382, *supra*, debemos acudir al historial legislativo de la Ley Núm. 100, *supra*, y a su jurisprudencia interpretativa.

En *Rodríguez Cruz v. Padilla Ayala*, 125 D.P.R. 486, 511 esc. 20 (1990), dictaminamos que debía atenderse al significado ordinario de estas palabras. También analizamos el historial legislativo de la Ley Núm. 100, *supra*, a los fines de determinar si ésta aplicaba a los municipios. Al resolver en la negativa, determinamos que dicho historial reflejaba que el objetivo principal de la ley es proteger a los empleados de la empresa privada y, por excepción, extender esta protección a los empleados de las agencias o instrumentalidades del Gobierno que operan como negocios o empresas privadas.[3]

De los debates previos a la aprobación de la Ley Núm. 100, *supra*, puede desprenderse que algunos Senadores tenían dudas sobre cuáles serían las agencias del Gobierno incluidas en dicha frase. Al analizar las discusiones que tuvieron lugar, surge que se entendió que la frase se refería a las corporaciones públicas del Gobierno de Puerto Rico.[4]

A la luz del historial legislativo de la Ley Núm. 100, *supra*, queda claro que la intención de la Asamblea Legis-

---

[3] Véase XII Diario de Sesiones de la Asamblea Legislativa, T. 2, págs. 681–688 (1959).

[4] El Senador Luis Negrón López expresó: "Ahí, entiendo yo, que están cubiertas *todas las corporaciones públicas de toda índole del gobierno de Puerto Rico.*" Diario de Sesiones, *supra*, pág. 685.

lativa fue que bajo el término *patrono* se incluyeran a todas las corporaciones públicas de nuestro esquema gubernamental. Nos corresponde, pues, analizar si la Compañía cumple con los requisitos de una corporación pública.

## III

Las corporaciones públicas surgieron finalizada la Primera Guerra Mundial como una respuesta a las nuevas tareas a las que se enfrentaron las naciones occidentales al comenzar a llevar a cabo, por sí mismas, actividades económicas que hasta entonces habían estado en manos de empresas privadas y las cuales el Gobierno sólo se había limitado a regular. Las corporaciones públicas se estructuraron con un alto nivel de autonomía fiscal y administrativa, con el propósito de evitar el formalismo burocrático gubernamental y facilitar la eficiencia y creatividad.[5]

Hoy las corporaciones públicas ocupan un lugar intermedio entre una autoridad pública pura y una compañía privada. Reciben, mediante su estatuto habilitador, cierto grado de independencia económica y administrativa. El Estado recoge la figura de la corporación pública como herramienta para implantar una política pública en particular, cuando determina que por ese medio es el que con más alta probabilidad de eficiencia puede llevar a cabo un programa o servicio.

No obstante, a pesar de la autonomía que las caracteriza, las corporaciones públicas no pierden su cualidad de instrumentalidad gubernamental, creadas para responder a propósitos de utilidad pública. Por tal razón, en la medida que llevan a cabo este tipo de función pública, tanto el Ejecutivo como la Legislatura ejercen, conforme a

---

[5] W. Friedman, ed., *The Public Corporation*, Canadá, Ed. The Carswell, Limited, 1954. Véase, además, *Torres Ponce v. Jiménez*, 113 D.P.R. 58 (1982).

la ley y a la costumbre, diferentes grados de control sobre sus funciones. En Puerto Rico, el control gubernamental sobre las corporaciones públicas se plasma mediante la propia ley habilitadora de la corporación pública de que se trate y las otras leyes que directa o indirectamente inciden sobre ésta. *Commoloco of Caguas, Inc. v. Benítez Díaz*, 126 D.P.R. 478, 491 (1990).[6]

■ Así lo hemos reconocido en nuestras decisiones anteriores. En *Canchani v. C.R.U.V.*, 105 D.P.R. 352 (1976), determinamos que la entonces Administración de Parques y Recreos Públicos de Puerto Rico era una agencia o instrumentalidad gubernamental que ejercía sus funciones en representación del Gobierno de Puerto Rico y no una corporación pública. Para llegar a esta determinación analizamos la ley habilitadora de dicha agencia y establecimos unos criterios que han de ser examinados en el proceso de determinar si una entidad gubernamental es o no una corporación pública. Dichos criterios incluyen: poseer ingresos propios; tener autonomía fiscal para realizar préstamos, emisión de bonos y cuentas bancarias; poseer propiedades; contar con una Junta de Directores; poder aceptar donaciones, y tener capacidad para concertar acuerdos o contratos.

Posteriormente ampliamos estos criterios e incluimos otros factores que deben considerarse. En *A.A.A. v. Unión Empleados A.A.A.*, 105 D.P.R. 437 (1976), dictaminamos que un tribunal debe examinar en cada caso *la conjunción* de los factores siguientes: si los empleados de la agencia están cubiertos por la Ley de Personal del Servicio Público de Puerto Rico; si los servicios prestados por la agencia, por su naturaleza intrínseca, nunca han sido prestados por

---

[6] Las corporaciones públicas han recibido también un trato distinto al que tradicionalmente han recibido los distintos departamentos ejecutivos del Estado, no tan sólo en lo que respecta a su organización sino también en cuanto a su responsabilidad civil por los daños y perjuicios que causan sus agentes, oficiales u empleados en el descargo de sus funciones oficiales. *Librotex, Inc. v. A.A.A.*, 138 D.P.R. 938 (1995).

la empresa privada; si la agencia está capacitada para funcionar como una empresa o negocio privado; si la agencia de hecho funciona como una empresa o negocio privado; el grado de autonomía fiscal de que disfruta la agencia; el grado de autonomía administrativa de que goza; si se cobra o no un precio o tarifas por el servicio rendido (precio que debe ser básicamente equivalente al valor del servicio); si los poderes y las facultades concedidos en la ley orgánica de la agencia la asemejan fundamentalmente a una empresa privada; si la agencia tiene o no la capacidad para dedicarse en el futuro a negocios lucrativos o a actividades que tengan por objeto un beneficio pecuniario.

Determinamos que además de estos criterios pueden considerarse otros: la estructura en sí de la entidad; la facultad de la agencia para demandar y ser demandada ilimitadamente; el poder obtener fondos propios en el mercado de valores a base de su récord económico y sin empañar el crédito del Estado Libre Asociado; la facultad de adquirir y administrar propiedades sin la intervención del Estado; el punto hasta donde el reconocimiento a los trabajadores de los derechos a que se refiere el primer párrafo del Art. II, Sec. 18, de la Constitución de Puerto Rico, L.P.R.A., Tomo 1, concuerda o no con el esquema constitucional. *Resolvimos también que ningún criterio es por sí solo determinante y que hay que examinar la conjunción de los diversos factores existentes. A.A.A. v. Unión Empleados A.A.A.*, supra, págs. 455–456.

Aunque los criterios elaborados en *A.A.A. v. Unión Empleados A.A.A.*, supra, fueron establecidos con el propósito de definir el término "agencia o instrumentalidad del gobierno de Puerto Rico que opera como negocio o empresa privada", en el contexto constitucional del Art. II, Secs. 17 y 18 de nuestra Constitución, *supra*, hemos ido extendiéndolos a la interpretación de las leyes que tienen términos similares.

Por ejemplo, en *Pagán et al. v. E.L.A. et al.*, 131 D.P.R. 795 (1992), utilizamos los criterios establecidos en *Canchani v. C.R.U.V.*, supra, y en *A.A.A. v. Unión Empleados A.A.A.*, supra, al determinar que la Corporación de Renovación Urbana y Vivienda (en adelante C.R.U.V.), antes y después de la vigencia de la ley que ordenó su disolución, continuaba siendo una corporación pública, aunque estuviese adscrita al Departamento de la Vivienda. Igualmente, en *J.R.T. v. Corp. del Conserv. Música P.R.*, 140 D.P.R 407 (1996), intimamos que las guías señaladas en *A.A.A.*, supra, a pesar de haber sido elaboradas para definir cuándo una agencia o instrumentalidad del Gobierno opera como negocio o empresa privada para fines constitucionales, son convenientes en el análisis estatutario de términos similares.([7])

Hoy nos corresponde determinar si la Compañía es una corporación pública a los fines de estar incluida en la definición de patrono de la Ley Núm. 100, *supra*, y de la Ley Núm. 382, *supra*. El análisis que ha de seguirse es acudir en primer lugar a su estatuto orgánico, es decir, a su fundamento legislativo, para determinar cuáles han sido los poderes otorgados a dicha entidad y la estructura fiscal y administrativa conferidas por dicho estatuto. En segundo lugar, nos corresponde analizar si los poderes otorgados a dicha Compañía satisfacen los criterios jurisprudenciales anteriormente esbozados. *Pagán et al. v. E.L.A. et al.*, supra, págs. 804–806.

---

([7]) Este Tribunal ha utilizado los criterios esbozados en *A.A.A. v. Unión Empleados A.A.A.*, 105 D.P.R. 437 (1976), como guías al definir lo que significa una agencia o instrumentalidad que opera como negocio o empresa privada al amparo de varias leyes: *J.R.M. v. J.R.T.*, 108 D.P.R. 448 (1979), para fines de la Ley de Relaciones del Trabajo; *Morales González v. J.R.T.*, 121 D.P.R. 249 (1988), para fines de la Ley de Salario Mínimo.

## IV

La Compañía fue creada en virtud de la Ley Núm. 114 de 23 de junio de 1961 (15 L.P.R.A. sec. 501 *et seq.*)([8]) con el propósito de desarrollar facilidades físicas para ofrecerles a los habitantes de Puerto Rico los medios para su recreo y expansión. Para estos efectos, la Compañía fue autorizada a desarrollar parques y sitios de recreo público, playas, sitios de veraneo, moteles, parques atléticos, gimnasios, embarcaderos, restoranes, marinas, piscinas públicas, lanchas, botes, deportes de pesca y cacería, y cualquier otra actividad o empresa que directa o indirectamente promoviese los medios para el recreo y la expansión del pueblo.

Posteriormente, mediante las Leyes Núm. 127 de 13 de junio de 1980 y Núm. 9 de 23 de julio de 1985, se enmendó el Art. 3 (15 L.P.R.A. sec. 503) y se aclaró la gran amplitud del ámbito de acción de la Compañía:

> La Compañía creada por este Capítulo tendrá los siguientes propósitos y objetivos principales:
> Desarrollar facilidades físicas para ofrecer a los habitantes de Puerto Rico medios para su recreo y expansión.
> Planificar, diseñar, construir, operar, mantener y conservar instalaciones y facilidades recreativas y deportivas.
> Vender, facturar y cobrar, por los servicios que se presten, a otras agencias, municipios y organismos gubernamentales, cuasi públicos y privados; incluyendo servicios prestados a comités, federaciones y asociaciones deportivas y recreativas.
> Dedicar sus recursos al desarrollo de cualquier actividad o empresa que promueva, directa o indirectamente, los medios para el recreo y la expansión del pueblo. 15 L.P.R.A. sec. 503.

La Exposición de Motivos de la Ley Núm. 127, *supra*, refleja que el propósito de la enmienda fue evitar que se diera una interpretación estrecha y limitada a las faculta-

---

([8]) Posteriormente, algunas secciones de la ley habilitadora de la Compañía de Fomento Recreativo (en adelante la Compañía) sufrieron varias enmiendas: la Ley Núm. 6 de 16 de abril de 1963, enmendó el Art. 7 (15 L.P.R.A. sec. 507); la Ley Núm. 127 de 13 de junio de 1980 enmendó el Art. 3 (15 L.P.R.A. sec. 503); la Ley Núm. 9 de 23 de julio de 1985 enmendó el Art. 3, *supra*, y la Ley Núm. 90 de 17 de noviembre de 1993 enmendó los Arts. 2–10 y 15 (15 L.P.R.A. secs. 504–510 y 515).

des de la Compañía. La Asamblea Legislativa entendió en ese momento que el ámbito de acción de dicha corporación pública era de gran amplitud, que trascendía el mero desarrollo de facilidades físicas.(⁹)

Posteriormente, la Ley Núm. 9 de 23 de julio de 1985 (15 L.P.R.A. sec. 503(2) y (5)) aclaró aún más el alcance de las facultades concedidas a la Compañía por la Asamblea Legislativa. Enmendó el inciso (2) del Art. 3, *supra*, y añadió el inciso (5) para que no quedase duda de que la Compañía goza de facultad para fijar y cobrar tarifas por el uso y disfrute de las facilidades recreativas, así como darlas en arrendamiento y fijar y cobrar el precio del arriendo.(¹⁰)

De este historial es evidente que la intención legislativa fue conceder amplias y abarcadoras facultades a la Compañía con el fin de que pueda llevar a cabo adecuadamente las funciones encomendadas. También queda claro que la Asamblea Legislativa rechazó la posibilidad de que se diese una interpretación limitada y estrecha a dichas facultades.

Entre las facultades concedidas por la ley orgánica de la Compañía, hay algunas que nuestra jurisprudencia ha determinado que son de particular importancia al momento de determinar si una entidad gubernamental opera como un negocio o empresa privada. Entre éstas se destacan aquellas que proveen para un funcionamiento independiente en el área administrativa y en el área fiscal.

Los poderes conferidos por la ley orgánica de la Compañía demuestran que ésta tiene un grado sustancial de autonomía fiscal. Está autorizada para emitir bonos e imponer gravámenes sobre sus ingresos o propiedades, sin hacer responsable al E.L.A. —ni a ninguna de sus subdivisiones políticas— del pago del principal o intereses de los bonos emitidos por la Compañía, Art. 5(i) y (n), 15 L.P.R.A.

---

(⁹) 1980 Leyes de Puerto Rico 508.

(¹⁰) 15 L.P.R.A. sec. 503. Exposición de Motivos de la Ley Núm. 9, *supra*, 1985 Leyes de Puerto Rico 694.

sec. 505(i) y (n). Dichos bonos serán autorizados por resoluciones de su Junta de Directores, Art. 11(b), 15 L.P.R.A. sec. 511(b). Goza también de la facultad para enajenar o disponer de sus propiedades y para aceptar donaciones, Art. 5(k) y (j), 15 L.P.R.A. sec. 505(k) y (j). Tiene completo dominio e intervención sobre cada una de sus propiedades y actividades, incluso el poder de determinar el carácter y necesidad de sus gastos y el modo de incurrirlos y autorizarlos, Art. 5(d), 15 L.P.R.A. sec. 505(d). Todos los dineros de la Compañía se mantendrán en cuentas separadas inscritas a nombre de la Compañía, Art. 10 (15 L.P.R.A. sec. 510).[11] También es relevante para la independencia fiscal, el poseer la capacidad para reaccionar a las condiciones económicas del mercado y poder manipular los costos y ganancias mediante el aumento de las tarifas por los servicios por los cuales cobra. *J.R.T. v. Corp. del Conserv. Música P.R.*, supra, págs. 897–898; *U.P.R. v. Asoc. Pur. Profs. Universitarios*, 136 D.P.R. 335 (1994). La Compañía tiene la facultad para variar o aumentar las tarifas que cobra por sus servicios y el canon de arrendamiento de sus facilidades. Art. 3(5), *supra*.

La Compañía también posee un grado sustancial de autonomía administrativa. Un examen del Art. 4(a) y (b) de la Ley Orgánica de la Compañía, 15 L.P.R.A. sec. 504(a) y (b), deja claro que la Compañía es una corporación pública e instrumentalidad del Estado *con personalidad y existencia legal separadas del Gobierno*, y sus funcionarios, agentes y empleados son de la Compañía y no del

---

[11] Cabe señalarse que para el momento de los hechos, la Compañía contaba con un fondo particular de ingresos. En virtud de la Ley Núm. 113 de 23 de junio de 1961 (13 L.P.R.A. ants. secs. 4001, 4010, 4040, 4060 y 4080) y de la Ley Núm. 5 de 8 de octubre de 1987 (13 L.P.R.A. ant. sec. 7001 *et seq.*), un por ciento del producto de los impuestos recaudados sobre ocupación de habitaciones de hoteles y casas de hospedaje ingresaba al "Fondo para el Fomento Recreativo de Puerto Rico". Esto se hacía luego de satisfacer la cantidad que anualmente el Secretario de Hacienda estimase suficiente para atender el pago de principal e intereses de los bonos u otras obligaciones emitidas por el Estado Libre Asociado para beneficio de la Compañía. Por lo menos, una vez al año los dineros de dicho fondo debían ser transferidos a la Compañía para ser usados en el desarrollo de sus propósitos.

Gobierno. Los poderes ejecutivos de dicha Compañía se ejercen a través de una junta de directores, Art. 4(c), 15 L.P.R.A. sec. 504(c). La Compañía está autorizada para adoptar, enmendar y derogar estatutos para regir sus negocios en general y desempeñar sus poderes y deberes, Art. 5(c), 15 L.P.R.A. sec. 505(c).[12] La Compañía posee la capacidad para demandar y ser demandada y para hacer los contratos que entienda necesarios al llevar a cabo sus funciones, Art. 5(e) y (f), 15 L.P.R.A. sec. 505(e) y (f).

Respecto a la administración de su personal,[13] es a la propia Compañía a quien corresponde asignar los deberes y compensación de sus empleados, Art. 5(h), 15 L.P.R.A. sec. 505(h). Los nombramientos, separaciones, ascensos, traslados, ceses, reposiciones, suspensiones, licencias y cambios de categoría se harán de acuerdo con las normas y reglamentos que prescriba el Administrador de Parques y Recreo Públicos *con la aprobación de la Junta de Directores de la Compañía.* Estas normas y reglamentos, *en tanto y en cuanto la Compañía lo estime compatible con sus in-*

---

[12] Un examen de los reglamentos promulgados por la Compañía sostiene la conclusión de que dicha corporación opera como negocio o empresa privada. Veamos.

El Reglamento Núm. 3291, Reglamento de Subasta de la Compañía de Fomento Recreativo provee las reglas y los procedimientos a los que habrá de atenerse la Compañía al adquirir, disponer o arrendar bienes muebles o inmuebles, o al llevar a cabo una construcción. Para estas funciones la Compañía se rige por su propio reglamento y no por las leyes y los reglamentos sobre subastas que aplican al Gobierno central.

El Reglamento Núm. 3408, Reglamento de los Centros Vacacionales, Áreas de Acampar y Reservaciones, provee para los cánones de arrendamiento que han de cobrarse en sus centros y áreas de acampar y el método para determinar un aumento de dichos cánones luego de un análisis de costos y beneficios.

[13] La Junta de Relaciones del Trabajo declaró a la Compañía "patrono" para propósitos de la Ley de Relaciones del Trabajo de Puerto Rico, Ley Núm. 130, *supra,* 29 L.P.R.A. sec. 61 *et seq.* Resolvió específicamente que los empleados de dicha entidad estaban exentos de la Ley de Personal del Gobierno y que éstos podían organizarse y negociar colectivamente. También determinó que la Compañía tiene la responsabilidad directa de administrar su personal. *Compañía de Fomento Recreativo y Federación Americana de Empleados Públicos U.F.C.W., A.F.l.-C.I.O. y Unión Independiente de Empleados de la Compañía de Fomento Recreativo,* P-87-19-D-89-1128. Véase, también, Op. Sec. just. Núm. 1965-40, que determinó que la Compañía está capacitada para operar como un negocio o empresa privada y, en consecuencia, está sujeta a la Ley de Salario Mínimo, Ley Núm. 96 de 26 de junio de 1956 (29 L.P.R.A. sec. 245 *et seq.*). Debe recalcarse que la Ley de Relaciones del Trabajo de Puerto Rico incluye *expresamente* a la Compañía como patrono. 29 L.P.R.A. sec. 63(2) y (11).

*tereses y el interés público*, seguirán las normas en vigor establecidas por las leyes sobre personal aplicables a los empleados del E.L.A. y serán preparadas *en consulta* con la oficina de personal del Gobierno, Art. 8(a), 15 L.P.R.A. sec. 508(a).

██    Del análisis anterior es evidente que la Ley Orgánica de la Compañía, al momento de los hechos, otorgaba a ésta una serie de poderes y facultades que satisfacen los criterios establecidos por nuestra jurisprudencia para determinar si una entidad gubernamental es una corporación pública. *Canchani v. C.R.U.V.*, supra. Éstos también satisfacen los criterios jurisprudenciales utilizados para determinar si una agencia o instrumentalidad gubernamental opera como negocio o empresa privada. *A.A.A. v. Unión Empleados A.A.A.*, supra.

## V

El Tribunal de Circuito de Apelaciones consideró determinante, al concluir que la Compañía no era patrono para propósitos de la Ley Núm. 100, *supra*, que al momento de ocurrir el traslado impugnado, el estatuto orgánico de la Compañía disponía que "la misma estaba bajo el control [administrativo] del Administrador de Parques y Recreos Públicos" (*Certiorari*, Apéndice, pág. 11), y que no fue hasta que entró en vigor la Ley Núm. 90, *supra*, que se cambió el lenguaje de la ley habilitadora de la Compañía, para consignar que dicha compañía estaba adscrita al Departamento. Sin embargo, un análisis de la posición que la Compañía ocupa dentro del organigrama gubernamental confirma que ésta operaba como una corporación pública independiente al momento de los hechos. Veamos.

El Art. 4(a) de la Ley Orgánica de la Compañía, *supra*, expresamente dispone que se crea una corporación pública como instrumentalidad gubernamental del Estado Libre

Asociado, bajo el nombre de "Compañía de Fomento Recreativo". El Art. 4(b) de dicha ley, *supra*, disponía, en su versión original, que la Compañía estaría sujeta al control administrativo del Administrador de Parques y Recreos Públicos.

Sin embargo, en 1980, con motivo de la creación del Departamento mediante la Ley Núm. 126 de 13 de junio de 1980, se le adscribió la Compañía a dicho departamento. Se enfatizó acto seguido, en la propia ley, que la Compañía *continuaría funcionando como corporación pública con las funciones y disposiciones señaladas por disposición de ley*. Art. 9 de la Ley Núm. 126, *supra*, 3 L.P.R.A. sec. 442h. Sorprendentemente, no es hasta las enmiendas de la Ley Núm. 90, *supra*, que se enmienda el Art. 2 de la Ley Orgánica de la Compañía, 15 L.P.R.A. sec. 502, para reflejar este cambio, vigente desde 1980, en virtud de la ley orgánica del Departamento.

El tribunal apelativo, en su análisis, pasó por alto que en virtud de la ley orgánica que creó el Departamento, la Compañía había cesado de estar "bajo el control administrativo del Administrador de Parques y Recreos Públicos" y que había quedado adscrita al Departamento desde su creación en 1980. Este era el estado de derecho vigente el 1ro de marzo de 1993, cuando ocurre el traslado impugnado.

Anteriormente tuvimos la oportunidad de enfrentarnos a la interrogante de si el mero hecho de que se adscribiese una corporación pública a un departamento gubernamental alteraba la condición jurídica de la corporación pública. En *Pagán v. E.L.A.*, supra, determinamos que el hecho de que la C.R.U.V. estuviera adscrita al Departamento de la Vivienda no alteraba su condición jurídica de corporación pública. Procedimos a examinar el estatuto que adscribía la C.R.U.V. al Departamento de Vivienda y resolvimos que

éste no había tenido el efecto de suprimir la naturaleza corporativa de la C.R.U.V.[14]

En el caso de autos, un análisis del Art. 9 de la Ley Orgánica del Departamento, *supra*, claramente refleja que *la intención legislativa al adscribir la Compañía al Departamento no fue suprimir la naturaleza corporativa de la Compañía* ni alterar su condición previa. Dispone el Art. 9, *supra*, que: "Dicho organismo continuará funcionando como corporación pública con las funciones y programas que se le han señalado por disposición de ley."

Un examen del historial legislativo de dicha disposición confirma esta conclusión. Éste refleja que el propósito de adscribir la Compañía al Departamento fue el promover que ambas instituciones funcionasen con un máximo de coordinación, evitar la duplicación de esfuerzos y evitar conflictos entre las operaciones gubernamentales.[15] Los debates en el Senado sobre el Sust. del P. del S. 1199, demuestran que los Senadores consideraron que la organización corporativa de la Compañía era mucho más flexible para enfrentarse a los problemas que agobiaban a la entonces Administración de Parques y Recreo.[16]

Nada hay en la ley habilitadora, ni en los reglamentos promulgados por la Compañía, que nos lleve a alterar nuestra conclusión de que la Compañía, al momento de los hechos, operaba como un negocio o empresa privada. Aunque hay algunos artículos de la Ley Orgánica de la Compañía[17] que reflejan alguna injerencia del Gobierno cen-

---

[14] Véase C. Ramos de Santiago, *El Gobierno de Puerto Rico*, 1970, págs. 653–662, donde se reconoce que diez (10) de las corporaciones públicas existentes en Puerto Rico, al momento de publicación, están adscritas a departamentos y agencias ejecutivas, aunque en la práctica son organismos funcionalmente autónomos. Una de éstas es la Compañía de Fomento Recreativo.

[15] Informe Conjunto de las Comisiones de Juventud y Deportes, de Gobierno y de Hacienda sobre el Sustitutivo al P. del S. 1199, abril de 1980.

[16] XXXIV Diario de Sesiones de la Asamblea Legislativa, 1980, pág. 1043.

[17] La ley habilitadora dispone que: la Compañía puede solicitar que se adquiera a su nombre propiedad de cualquier forma legal, incluso la expropiación, Art. 5(g) y (o), 15 L.P.R.A. sec. 505(g) y (o); su Junta de Directores estaría presidida por el

tral en el funcionamiento de la Compañía, esto no priva a la Compañía de su condición de corporación pública. Lo que se persigue con dichas disposiciones es lograr que el Gobierno le preste de modo indirecto un apoyo a la Compañía, ya que el propósito de escoger la estructura de una corporación pública es proveer para un organismo de gran flexibilidad y potencial de desarrollo *dentro* del sistema gubernamental.

## VI

Una vez concluido que la Compañía es una corporación pública y, a su vez, una agencia o instrumentalidad que opera como negocio o empresa privada, y por lo tanto un patrono para los fines de la Ley Núm. 100, *supra*, y la Ley Núm. 382, *supra*, procede examinar si hubo discrimen por razones políticas al amparo de estas leyes.

En *Rodríguez Cruz v. Padilla Ayala*, 125 D.P.R. 486, 506 (1990), determinamos específicamente que la conclusión de hechos del tribunal sentenciador —con base en la prueba— de que un demandante fue discriminado por razones políticas, merece gran deferencia en apelación o revisión en ausencia de circunstancias extraordinarias de error manifiesto, pasión, prejuicio o parcialidad. *Acosta & Rodas, Inc. v. PRAICO*, 112 D.P.R. 583, 608 (1982).

De los hechos alegados por las partes, y creídos por el Tribunal de Primera Instancia, se desprende que el señor Huertas Alicea alegó y probó que era una persona reconocida dentro del Partido Popular Democrático y que fue asignado a un nuevo puesto donde sus labores eran prácticamente inexistentes. También demostró que fue

---

entonces Administrador de Parques y Recreo Público, Art. 4(c), 15 L.P.R.A. sec. 504(c); el Contralor examinará de tiempo en tiempo las cuentas y la contabilidad de la Compañía, Art. 10 (15 L.P.R.A. sec. 510); la Compañía disfruta de exención de . contribuciones sobre la propiedad y en la explotación de sus empresas y actividades, Art. 14 (15 L.P.R.A. sec. 514).

sustituido por una persona miembro del Partido Nuevo Progresista, el cual pertenecía a una escala inferior dentro de la escala de personal de la Compañía. Además, quedó probado que el traslado del demandante se llevó a cabo en marzo de 1993, dentro de los seis (6) meses después de las elecciones generales en noviembre de 1992. Estos hechos, creídos por el tribunal sentenciador, son suficientes para activar la presunción de discrimen que proveen los Arts. 1 y 2 de la Ley Núm. 382, *supra*:

> Todo patrono que despida, suspenda, rehúse restituir en su trabajo, reduzca el salario, rebaje en categoría, aumente las horas de labor o imponga o intente imponer condiciones de trabajo más onerosas a un empleado o ex empleado suyo, o discrimine en cualquier forma o amenace cometer contra él cualquiera de tales actos porque esté afiliado a determinado partido político incurrirá en responsabilidad civil por suma igual al doble del importe de los daños. 29 L.P.R.A. sec. 136.
>
> Se presumirá que cualquiera de los actos mencionados en la sección precedente obedece a que el empleado o ex empleado está afiliado a determinado partido político cuando el patrono haya realizado el acto sin justa causa o *dentro de tres (3) meses antes o seis (6) meses después de haberse celebrado cualquier elección política en Puerto Rico.* 29 L.P.R.A. sec. 137.

La Compañía, por su parte, alegó que el señor Huertas Alicea seguía teniendo el mismo sueldo y que su traslado obedeció a necesidades de servicio. No presentó prueba que explicara cuáles eran estas necesidades de servicio ni cómo, con el traslado, se lograba una mejor utilización de los recursos de la Compañía.

■ Hemos establecido que simples alegaciones no sirven para rebatir la presunción de discrimen activada por las alegaciones y la prueba del demandante. *Ibáñez v. Molinos de P.R., Inc.*, 114 D.P.R. 42 (1983); *Ramos v. Srio. de Comercio*, 112 D.P.R. 514 (1982); *Báez Cancel v. Alcalde Mun. de Guaynabo*, 100 D.P.R. 982 (1972). La prueba presentada por el señor Huertas Alicea y creída por el Tribu-

nal de Primera Instancia estableció una presunción de discrimen político que no fue rebatida por la Compañía.

Por los fundamentos antes expuestos, *resolvemos que la Compañía de Fomento Recreativo es una agencia o instrumentalidad que opera como negocio o empresa privada para fines de la Ley Núm. 382, supra, y la Ley Núm. 100, supra. Resolvemos también que se activó la presunción de discrimen de la Ley Núm. 382, supra, la cual no fue rebatida por la Compañía. Procede revocar la decisión del Tribunal de Circuito de Apelaciones y confirmar la sentencia del Tribunal de Primera Instancia en su totalidad.*

*Se dictará la sentencia correspondiente.*

El Juez Asociado Señor Negrón García concurrió sin opinión escrita. El Juez Asociado Señor Fuster Berlingeri, aunque está de acuerdo con que en el caso de autos hubo discrimen por razones políticas —por lo cual el traslado del empleado fue ilegal e inválido— disintió respecto a la aplicación aquí de la Ley Núm. 100 de 30 de junio de 1959 (26 L.P.R.A. sec. 146 *et seq.*). El Juez Asociado Señor Corrada Del Río disintió sin opinión escrita.