Opinión concurrente emitida por el
Juez Asociado Señor Fuster Berlingeri.
El caso de autos presenta la ocasión para examinar la *33 situación normativa respecto al Banco de Desarrollo Económico para Puerto Rico, para determinar lo pertinente a la facultad para despedir a sus empleados.
Para ello emitimos la opinión de autos, formulada con anterioridad a la mayoritaria.
I
La compañía Hecson de Puerto Rico (Hecson) inició operaciones en 1992. Sonia Vázquez Cintrón, abogada de profesión (recurrida o Vázquez), y Héctor L. Andújar Ruiz, quienes estaban casados entre sí para esa fecha, figuraron como los incorporadores de dicha empresa.
Para 1995 Hecson se encontraba en una situación económica precaria, razón por la cual presentó una solicitud de préstamo al Banco de Desarrollo Económico para Puerto Rico (Banco o peticionario) por la suma de $500,000. La solicitud de préstamo promovida por Hecson fue considerada por el Comité de Crédito Gerencial del Banco, que eventualmente la denegó debido a que los estados financieros sometidos por la compañía reflejaban que la rentabilidad de las operaciones de Hecson iban en descenso, la deuda de la empresa presentaba un cuadro serio de insolvencia y la propiedad ofrecida como colateral se encontraba gravada por dos hipotecas previas.
Posteriormente, en septiembre de ese mismo año, la recurrida comenzó a laborar en el Banco, ocupando el puesto de Líder de Grupo en la División Legal.(1) Ese mismo mes, Hecson sometió al Banco una solicitud de reconsideración a la denegatoria de su solicitud de préstamo original. A tales fines, redujo la cantidad solicitada a $300,000. Dicha solicitud fue nuevamente denegada por las mismas razo *34 nes y fundamentos en los que descansó la denegatoria original.
En enero de 1996 Hecson sometió una segunda solicitud de reconsideración a la denegatoria de su solicitud de préstamo. En esta ocasión aumentó las garantías ofrecidas, añadiendo como fuente secundaria de repago una hipoteca sobre la maquinaria del negocio, una cesión de cuentas por cobrar y una tercera hipoteca sobre la residencia de los esposos incorporadores. Tanto la recurrida como Andújar se comprometieron a garantizar solidariamente el préstamo. Contando con estas garantías adicionales, el Comité de Crédito Gerencial aprobó el préstamo solicitado por la cantidad de $300,000 con intereses a razón de 2% sobre la tasa preferencial anual. Conforme a los términos establecidos para la concesión del referido préstamo, el 19 de abril de 1996 la recurrida suscribió una carta de garantía personal para garantizar solidariamente el préstamo otorgado por el Banco a favor de Hecson. También suscribió el contrato de préstamo otorgado en igual fecha en calidad de “Garantizadora Solidaria”, así como un pagaré por la suma principal de $300,000 a favor del Banco, suscrito igualmente como garantizadora.
Posteriormente, en 1997, la recurrida fue ascendida en el Banco a ocupar la plaza de Directora de Control de Calidad de Crédito. Más tarde, en marzo de 2001, pasó a ocupar el puesto de Directora de la División Interina de Préstamos Especiales y Recobro del Banco.
El préstamo de $300,000 desembolsado a Hecson no fue suficiente para resolver su difícil situación financiera, por lo que la empresa solicitó dos moratorias en el pago del principal e intereses, las cuales fueron concedidas. Aún así, durante noviembre de 1997 Hecson cerró operaciones de forma permanente. Tanto la compañía como la recurrente y su esposo, incumplieron crasamente con los términos del contrato de préstamo, puesto que ninguno de ellos realizó pago alguno para acreditar a la deuda. La hipoteca que *35 gravaba la propiedad dada en garantía fue ejecutada por un acreedor preferente y vendida en subasta pública. De esta venta no resultó sobrante alguno para abonar a la acreencia del Banco. Parte de la maquinaria y del equipo que servía de colateral en el préstamo fue vendido sin el consentimiento del Banco y otra parte fue desechada por alegadamente estar defectuosa. Por consiguiente, el Banco no pudo cobrar absolutamente nada de su acreencia.
Ante la falta de pago del préstamo, en abril de 2000 el Banco presentó ante el Tribunal de Primera Instancia, Sala Superior de San Juan, una demanda para el cobro de dinero y la ejecución de hipoteca mueble e inmueble por la vía ordinaria.(2) Figuraron como demandados en dicho caso la empresa Hecson, así como los esposos garantizadores, la recurrida y su esposo, y la Sociedad Legal de Gananciales integrada por ambos. Ninguno de los demandados compareció a los procedimientos del tribunal a pesar de haber sido debidamente emplazados, por lo que el 8 de mayo de 2002 se procedió a dictar la sentencia en rebeldía en su contra. Mediante dicha sentencia se condenó a ambos demandados, por sí y en representación de la Sociedad Legal de Gananciales integrada por ellos, a satisfacer solidariamente la suma de $485,398.98, más intereses a razón de $55.01 diarios hasta el saldo de la deuda. La recurrida nunca realizó acto afirmativo alguno por satisfacer su obligación, a pesar de ser garantizadora solidaria del préstamo y de tener una sentencia judicial en su contra.
Considerando todas las circunstancias del caso, y luego de haber ordenado la realización de una investigación interna sobre los hechos aquí expuestos, María M. Fuentes Pujols, quien para ese momento fungía como Presidenta del Banco, le remitió una carta a Vázquez en la cual le señalaba el balance adeudado por Hecson y su condición de garantizadora de dicha deuda. Fuentes Pujols concluyó la *36 carta informándole de su intención de despedirla, así como del derecho que le asistía a una vista informal o de preterminación de empleo y el término para ejercitarlo; la recurrida ejerció este derecho. Posteriormente, en abril de 2002, la Presidenta del Banco le informó mediante carta a Vázquez su decisión de despedirla del puesto de carrera que ocupaba.
Por razón del despido, la recurrida presentó una querella formal ante la Junta de Directores del Banco, en la que alegó haber sido despedida injustificadamente. Solicitó la celebración de una vista administrativa formal, la cual se le concedió y fue presidida por el Oficial Examinador, Hon. Ángel F. Rossy García. Por su parte, el Banco alegó que el despido de la recurrida fue justificado, ya que ésta incurrió en un serio conflicto de intereses y en conducta desleal, por lo cual no se justificaba la concesión de remedio alguno a favor de la recurrida. Con este cuadro de hechos, el 18 de octubre de 2004 el Oficial Examinador concluyó que el despido de Vázquez fue injustificado, por lo que declaró dio lugar a la querella y ordenó la reinstalación inmediata de la recurrida en su puesto, así como el pago de todos los salarios y beneficios dejados de recibir. El Banco solicitó la reconsideración de esta resolución, la cual fue denegada.
Oportunamente, el Banco cuestionó tal determinación ante el Tribunal de Apelaciones presentando allí un recurso de revisión administrativa. Mediante una sentencia dictada el 28 de septiembre de 2005, el Tribunal de Apelaciones confirmó la resolución del oficial examinador. El Banco presentó entonces una moción de reconsideración, la cual también fue denegada.
Inconforme con la actuación del foro apelativo, el 1 de diciembre de 2005 el Banco presentó un recurso de certiorari ante nuestra consideración y señaló los siguientes cinco errores del Tribunal de Apelaciones:
A. Erró el Tribunal de Apelaciones al confirmar al Hon. Ofi *37 cial Examinador al concluir que no existía justa causa para el despido de la Lie. Vázquez.
B. Erró el Tribunal Apelativo al concluir que la Lie. Vázquez no incurrió en conflicto de intereses.
C. Erró el Tribunal Apelativo al concluir que la Lie. Vázquez no incurrió en conducta desleal.
D. Erró el Hon. Oficial al conceder los remedios otorgados.
E. Erró el Tribunal de Apelaciones al confirmar al Oficial Examinador y no disponer que el despido fue uno justificado. (Enfasis suprimido.) Certiorari, pág. 10.
Expedido el Certiorari, procedemos a resolver.
II
A. La Ley de Indemnización por Despido Injustificado, Ley Núm. 80 de 30 de mayo de 1976 (29 L.P.R.A. secs. 185a-185m) (Ley Núm. 80) fue creada en respuesta al interés apremiante del Estado de regular las relaciones obrero-patronales, de evitar prácticas injustas del trabajo y a la existencia en nuestra jurisdicción de una clara política pública de protección a los derechos de los trabajadores. Díaz v. Wyndham Hotel Corp., 155 D.P.R. 364 (2001); Arroyo v. Rattan Specialties, Inc., 117 D.P.R. 35 (1986). La intención del legislador al aprobar la Ley Núm. 80 fue hacerla aplicable con carácter de exclusividad a los empleados de la empresa privada y a los de aquellas corporaciones públicas que operan como empresa privada. Guía Revisada para la Interpretación y Aplicación de la Ley Núm. 80, Departamento del Trabajo y Recursos Humanos del Gobierno de Puerto Rico, 21 de septiembre de 2000, pág. 27. Dicha ley provee a los trabajadores despedidos sin justa causa el derecho a una indemnización que les permita suplir sus necesidades básicas durante el tiempo que razonablemente les debería tomar conseguir un nuevo empleo. Esta indemnización es comúnmente conocida como la “mesada”. Id. En ausencia de otra ley aplicable o de un convenio colectivo *38 que provea otro remedio, la indemnización de la mesada es el remedio exclusivo para un despido injustificado. H.I.E.Tel. v. Celulares, 169 D.P.R. 1 (2006); Biver v. Coop. Fed. Emp. Telefónicos, 145 D.P.R. 165 (1998).
Como se mencionara anteriormente, aquellas corporaciones públicas que operan como empresa privada están sujetas a las disposiciones de la Ley Núm. 80. Corresponde entonces determinar si el Banco es una corporación pública que opera como empresa privada y, por ende, está sujeto a las disposiciones de la referida ley.
En casos anteriores hemos expuesto los criterios que se han de examinar para determinar si una entidad gubernamental es o no una corporación pública que funciona como una empresa privada. Estos son: poseer ingresos propios; tener autonomía fiscal para realizar préstamos, emisión de bonos y cuentas bancarias; contar con una Junta de Directores; poder aceptar donaciones (Fred y otros v. E.L.A., 150 D.P.R. 599 (2000)); tener la capacidad para concertar acuerdos o contratos; si los empleados están cubiertos por la Ley de Personal del Servicio Público de Puerto Rico; si los servicios prestados han sido tradicionalmente ofrecidos por la empresa privada; si la entidad está capacitada para funcionar como una empresa o un negocio privado; si de hecho funciona como una empresa o un negocio privado; el grado de autonomía fiscal que disfruta; el grado de autonomía administrativa del que goza; si se cobra o no un precio o unas tarifas por el servicio rendido (precio que debe ser básicamente equivalente al valor del servicio); si las facultades y los poderes concedidos en la ley orgánica de la entidad la asemejan a una empresa privada; la estructura en sí de la entidad; la facultad para demandar y ser demandada ilimitadamente; el poder obtener fondos propios en el mercado de valores a base de su expediente económico y sin empeñar el crédito del Estado Libre Asociado; si tiene sucesión perpetua, y la facultad de adquirir y administrar propiedades sin la intervención del Estado. Huertas v. Cía. Fomento Recreativo, 147 D.P.R. 12 (1998); A.A.A. v. Unión *39 Empleados A.A.A., 105 D.P.R. 437 (1976). Ningún criterio es determinante por sí solo. En cada caso se deben examinar la conjunción de factores existentes para, a su luz, resolver si la entidad concernida funciona o no como un negocio privado. A.A.A. v. Unión Empleados A.A.A., supra.
Al examinar la Ley del Banco de Desarrollo Económico para Puerto Rico, Ley Núm. 22 de 24 de julio de 1985 (7 L.P.R.A. secs. 611-611p), ley habilitadora del Banco, surge que aunque éste realiza funciones parecidas a otros ban-cos, dicho Banco tiene unas características muy particulares que lo convierten en una entidad sui generis.
Su ley habilitadora dispone que los negocios del Banco serán administrados y sus poderes corporativos serán ejercidos por una Junta de Directores. 7 L.P.R.A. see. 6lid. Aunque contar con una Junta de Directores es uno de los criterios que se han de analizar para determinar si una corporación pública actúa como empresa privada, al examinar la composición de la Junta de Directores del Banco es evidente que ésta no se ajusta al concepto tradicional de lo que es una Junta de Directores de una empresa privada. La ley habilitadora del Banco establece específicamente la composición de dicha Junta. La ley dispone que estará compuesta por nueve miembros, a saber,
El Presidente del Banco Gubernamental a quien se designa como Presidente de la Junta de Directores del Banco de Desarrollo Económico de Puerto Rico, el Secretario de Desarrollo Económico y Comercio, o uno de los directores o jefes de los componentes del Departamento de Desarrollo Económico y Comercio nombrado por el Secretario, el Director Ejecutivo de la Compañía de Turismo, el Administrador de Fomento Económico y el Secretario de Agricultura serán miembros ex officio de la Junta mientras desempeñen sus cargos. Los restantes cuatro (4) miembros representarán al sector privado y serán nombrados por el Gobernador de Puerto Rico con el consejo y consentimiento del Senado. Uno de los miembros que representará al sector privado será una persona identificada activamente con el sector agrícola, otra identificada activamente con el sector comercial y otra con el sector manufacturero. 7 L.P.R.A. sec. 611d(a).
*40 Como se puede apreciar, el Gobierno está inmiscuido por completo en la composición del organismo que estará a cargo de administrar y ejercer los poderes ejecutivos del Banco. La mayor parte de los miembros de la Junta de Directores son funcionarios públicos y los restantes miembros son nombrados por el Gobernador con el consejo y consentimiento del Senado. Esta peculiaridad distingue la Junta del Banco de lo que usualmente es una Junta de Directores en una empresa privada.
El Banco se diferencia también del resto de las entidades bancarias del país en que su meta principal no es operar lucrativamente. Más bien, su propósito primordial es la promoción del desarrollo del sector privado de la economía de Puerto Rico, haciendo disponible los préstamos directos, las garantías de préstamos y los fondos para invertir a cualquier persona natural o jurídica, con o sin fines de lucro, dedicada a la manufactura, el comercio, la agricultura, el turismo y otras empresas de servicio, dando preferencia a los pequeños y medianos empresarios puertorriqueños. 7 L.P.R.A. sec. 611a.
El Banco también se distingue de otros bancos que ope-ran como empresa privada en las fuentes que tiene disponible para financiar sus operaciones. A diferencia de otros bancos, sus recursos no sólo provienen de intereses de préstamos e inversiones, sino que cuenta también con asignaciones legislativas y fondos federales. M. Díaz Saldaña, Informe de Auditoría de la Oficina del Contralor de Puerto Rico, 1998.
Anteriormente se identificaron los criterios que se han de examinar para determinar si una entidad gubernamental es o no una corporación pública que opere como negocio privado. Al analizar el funcionamiento del Banco y su ley habilitadora, a la luz de esos criterios, es evidente que aunque éste realiza funciones parecidas a otros bancos, prevalecen unas características muy particulares que lo diferen *41 cian fundamentalmente de los demás bancos y lo convierten en una entidad sui generis. Por consiguiente, es menester concluir que por no operar primordialmente como una empresa privada, dicho Banco no está sujeto a las disposiciones de la Ley Núm. 80.
B. Para la fecha en que ocurrieron los hechos de este caso, estaba vigente la Ley Núm. 5 de 14 de octubre de 1975 (3 L.P.R.A. sec. 1301 et seq.), conocida como la Ley de Personal del Servicio Público de Puerto Rico (Ley de Personal). La ley referida creó un sistema de administración de personal especialmente diseñado para asegurar la aplicación del principio de mérito en el empleo público. Sin embargo, no todos los empleados públicos estaban cobijados por la Ley de Personal, pues ésta, en su Sec. 10.6 (3 L.P.R.A. ant. sec. 1338), establecía una serie de exclusiones.(3) Según esta sección, la ley habilitadora del Banco dispone: “La disposición de todos los asuntos del personal del Banco se efectuará sin sujeción a la Ley Núm. 5 del 14 de octubre de 1975, conocida como ‘Ley de Personal del Servicio Público de Puerto Rico’.” 7 L.P.R.A. sec. 611c.
En vista de que las acciones relacionadas al personal del Banco no están sujetas a las disposiciones de la Ley Núm. 80 ni de la Ley de Personal, los problemas como el que nos concierne en este caso deben adjudicarse conforme a las propias normas del Banco. Pasamos entonces a determinar si según las normas y los reglamentos del Banco, el despido de la recurrida fue justificado.
*42 III
El Banco alega que el despido de Vázquez estuvo justificado, ya que ésta incurrió en conflicto de intereses y conducta desleal al Banco. Le asiste la razón. Veamos.
Las reglas y los reglamentos que establecen las normas de trabajo de una empresa forman parte del contrato de trabajo. Srio. del Trabajo v. G.P. Inds., Inc., 153 D.P.R. 223 (2001). El incumplimiento de estas normas podrá dar lugar a un despido justificado. íd.
El manual del Banco, que establece un procedimiento para aplicar las acciones correctivas de disciplina, dispone que las faltas allí enumeradas, así como cualquier otra falta que sea considerada perjudicial a los mejores intereses del Banco, darán lugar a sanciones disciplinarias. En lo pertinente, dispone que “se podrán tomar acciones en situaciones no contempladas aquí, dependiendo de la severidad del acto y/o se impondrán acciones más severas en caso de falta extrema”. Procedimiento para aplicar acciones correctivas de disciplina, 13 de mayo de 1997, pág. 1. Apéndice del Certiorari, pág. 120. Entre las faltas enumeradas en dicho manual se encuentran el realizar funciones o tareas que conlleven un conflicto de intereses con sus obligaciones como empleado del Banco y la violación a la Ley de Ética Gubernamental y sus reglamentos, así como a cualquier otra disposición relacionada con la ética de los empleados públicos. Guías para acciones correctivas de disciplina, 13 de mayo de 1997, pág. 3-4. Apéndice del Certiorari, págs. 124-128. De un análisis de los hechos del caso, tenemos que ineludiblemente concluir que, mediante sus actuaciones, la recurrida incurrió en ambas faltas.
La Ley de Ética Gubernamental, Ley Núm. 12 de 24 de julio de 1985 (3 L.P.R.A. sec. 1801 et seq.), censura enérgicamente cualquier tipo de conflicto de interés. Específicamente, en su Exposición de Motivos dispone: “[e]s intolerable que existan funcionarios públicos en representación de *43 la administración del Gobierno que puedan lucrarse del patrimonio del pueblo. Los conflictos de intereses, especialmente financieros ... son también intolerables.” 1985 Leyes de Puerto Rico 708, 709. Dicha ley define, en su Art. 1.2(s), el conflicto de intereses como “aquella situación en la que el interés personal o económico del servidor público o de personas relacionadas a éste, está o puede razonablemente estar en pugna con el interés público”. 3 L.P.R.A. see. 1802(s). Precisamente ésta es la situación presente en el caso.
La recurrida, en virtud de su puesto como Directora de la División Interina de Préstamos Especiales y Recobro, estaba encargada de recobrar lo adeudado al Banco por los clientes morosos. Al mismo tiempo, no hizo acto afirmativo alguno por satisfacer su deuda con el Banco, la cual sobrepasaba los $485,000. Cabe señalar que la recurrida nunca hizo pago alguno en abono a la deuda, a pesar de que al momento del despido ésta devengaba un sueldo anual de $64,896. Por consiguiente, el Banco se vio obligado a recurrir a un procedimiento judicial de cobro de dinero. Aún así, Vázquez no respondió por su deuda, sino que ésta ignoró todos los procedimientos. El tribunal, entonces, procedió a dictar sentencia en rebeldía. Al momento del despido, la recurrida tenía una sentencia final y firme en su contra, la cual le ordenaba pagar al Banco la cantidad de $485,398.88.
Vázquez era consciente de que las dos solicitudes de préstamos originales presentadas por Hecson habían sido denegadas por falta de garantías suficientes para el repago. Por tal razón, con miras a obtener el dinero solicitado, ésta se ofreció como garantizadora solidaria del préstamo. Valga resaltar que para esa fecha la recurrida ya trabajaba en el Banco, por lo que tenía un deber de fidelidad y fiducia para con éste. Vázquez incumplió con su deber al llevar a cabo actos de mala fe que indujeron al Banco a desprenderse de una cantidad extraordinaria de *44 dinero, con la falsa creencia de que el repago de dicho dinero estaba garantizado.
Está firmemente establecido en nuestra jurisdicción que los oficiales y directores de una corporación tienen un deber de fiducia y lealtad con la entidad para la cual trabajan. A los directores y oficiales se les confieren ciertas facultades de administración para que las ejerzan en beneficio de la corporación. Por tal razón, éstos se encuentran en una relación fiduciaria frente a la entidad. En vista de tal relación, los directores y oficiales deben lealtad absoluta, honestidad y buena fe a la corporación. Su responsabilidad es manejar los asuntos de la entidad para el beneficio y la protección de los intereses de la corporación. Estos, además, deben actuar en todo momento buscando el beneficio de la entidad y no su beneficio personal. En el cumplimiento de esta obligación, el trato honesto y la buena fe serán determinantes. C.E. Díaz Olivo, Corporaciones, San Juan, Pubs. Puertorriqueñas, 1999, pág. 112; C.E. Díaz Olivo, La responsabilidad de los directores y oficiales de la corporación, un análisis comparado: Estados Unidos, España y Puerto Rico, 52 Rev. C. Abo. P.R. 183-184 (1991); L.M. Negrón Portillo, Derecho Corporativo Puertorriqueño, 2da ed., San Juan, [s. Ed.], 1996, pág. 219.
El profesor de derecho corporativo, Carlos Díaz Olivo, expone en su libro Corporaciones, op. cit, pág. 113, lo siguiente:
El criterio determinante al examinar la conducta de los administradores a la luz del deber de lealtad, se circunscribe a las siguientes interrogantes: ¿Muestran sus actuaciones y conducta una falta de buena fe para con la corporación y sus accionistas? ¿Han obtenido o retenido para sí, ganancias y beneficios que mediante un esfuerzo adecuado o una actuación honesta de su parte hubiesen correspondido a la corporación?
Si la contestación es afirmativa, los administradores han violado su obligación de lealtad.
Así pues, el deber de lealtad encierra tanto la obligación afirmativa de proteger los intereses de la corporación, como la obligación de abstenerse de aquella conducta que lesione los intereses de la entidad .... (Escolios omitidos.)
*45 En el presente caso, ambas interrogantes se contestan en la afirmativa. Las actuaciones de la recurrida denotan que ésta antepuso sus intereses personales por encima de sus deberes como oficial del Banco y como funcionaría pública. Forzoso es concluir que Vázquez violó su deber de lealtad e incurrió en un claro conflicto de intereses. Ya en Mercedes Bus Line v. Tribl. de Distrito, 70 D.P.R. 690, 695 (1949), habíamos resuelto que una conducta que implique falta de lealtad y honradez hacia el patrono, constituye motivo justificado para despedir a un empleado.
Aunque como regla general no se favorece el despido como sanción a la primera falta, ello podría considerarse justificado si dicha acción u omisión, por su gravedad y potencial de agravio, pone en riesgo el orden, la seguridad, la eficiencia y el ambiente de trabajo, afectando de esa forma la buena marcha y el funcionamiento normal de la empresa. Srio. del Trabajo v. G.P. Inds., Inc., supra; Rivera v. Pan Pepín, 161 D.P.R. 681 (2004); Delgado Zayas v. Hosp. Int. Med. Avanzada, 137 D.P.R. 643, 650 (1994).
El caso ante nuestra consideración nos presenta una de esas situaciones en las cuales el despido es justificado a la primera falta. El conflicto entre los intereses personales de la recurrida y sus deberes como funcionaría del Banco es simplemente irreconciliable. Mantener a Vázquez en su puesto de alta jerarquía, laborando con la delincuencia y el incumplimiento de los préstamos, luego de ésta haber defraudado a la entidad y haberse aprovechado del erario, comprometería la reputación y el buen nombre del Banco. Debilitaría, además, la obligación del Banco de exigirle a sus deudores ordinarios que respondan ante el reclamo de pago si la misma persona encargada de conjurar la morosidad de tales deudores adeuda, a su vez, al Banco una sentencia que ya sobrepasa el medio millón de dólares. Además, someter a los demás miembros de la división a continuar trabajando con una persona tan poco comprometida con sus deberes como oficial del Banco, ocasionaría *46 hostilidad y afectaría adversamente el ambiente de trabajo.
Es evidente de todo lo anterior que el despido de Vázquez fue justificado, por lo que ésta no tiene remedio alguno bajo la ley. Por los fundamentos expuestos, procede que se revoque la sentencia dictada por el Tribunal de Apelaciones y se ordene la desestimación de la querella presentada por ésta ante' el Oficial Examinador.

 Al iniciar sus labores en el Banco de Desarrollo Económico para Puerto Bico (Banco), la recurrida prestó juramento de fidelidad y de toma de posesión de su cargo ante notario público. De dicho juramento emanan las obligaciones de total fidelidad al cargo ocupado.

 Banco de Desarrollo Económico para Puerto Rico v. Hecson de Puerto Rico et als., Civil Núm. KCD2000-0219.

 La Ley de Personal del Servicio Público de Puerto Rico (Ley de Personal) fue sustituida por la Ley Núm. 184 de 3 de agosto de 2004, según enmendada, Ley para la Administración de los Recursos Humanos en el Servicio Público del Estado Libre Asociado de Puerto Rico, 3 L.P.R.A. see. 1461 et seq. La See. 5.3 de esta nueva ley, 3 L.P.R.A. sec. 1461e, contiene unas exclusiones similares a las de la Sec. 10.6 de la antigua Ley de Personal, 3 L.P.R.A. ant. see. 1338.