# 2006 DTA 19

## TRIBUNAL DE CIRCUITO DE APELACIONES
## REGIÓN JUDICIAL DE SAN JUAN
## PANEL I

PLAN DE SALUD U.I.A., INC.
Demandante

v.

AUTORIDAD DE ACUEDUCTOS Y ALCANTARILLADOS; UNIÓN INDEPENDIENTE AUTÉNTICA
Demandadas

Núm. KLCE-2005-01639

San Juan, Puerto Rico, a 22 de noviembre de 2005

Panel integrado por su Presidenta, la Juez Rodríguez de Oronoz,
la Juez Peñagarícano Soler y el Juez López Feliciano

López Feliciano, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

La Autoridad de Acueductos y Alcantarillados, en adelante la A.A.A., comparece ante este foro apelativo solicitando la revisión y revocación de una resolución emitida por la Sala Superior de San Juan del Tribunal de Primera Instancia, en adelante T.P.I., el 9 de noviembre de 2005 y notificada vía correo electrónico en esa misma fecha. Mediante dicha resolución, el T.P.I. dictó un interdicto (*injunction*) preliminar, ordenando a la A.A.A. pagar al Plan de Salud de la U.I.A., Inc. ciertas aportaciones en beneficio de los empleados subscriptores de dicho plan, correspondientes a los meses de junio a noviembre de 2005 montantes a $6,426,225.00.

Mediante nuestra resolución del pasado 10 de noviembre de 2005, dispusimos que por tratarse el presente recurso de uno de *certiorari,* conforme a la Regla 32 del Reglamento de este Tribunal, se instruyó a la Secretaría para que modificara el registro alfanumérico del mismo y así modificado lo notificara a todas las partes.

Con el beneficio de la comparecencia de todas las partes, estamos en condiciones de disponer del recurso, lo que a continuación hacemos.

# I
## LAS PARTES EN EL LITIGIO

El Plan de Salud de la U.I.A., Inc., al cual en adelante también nos referiremos como el Plan, es una corporación sin fines pecuniarios creada con el propósito de brindar servicios de cuidados de salud a los empleados de la A.A.A. que sean miembros de la Unión Independiente Auténtica de la A.A.A., en adelante U.I. A., y a exempleados jubilados de la A.A.A., de conformidad con los reglamentos de la U.I.A. y las disposiciones del Convenio Colectivo entre la U.I.A. y la A.A.A. Este Plan opera bajo las disposiciones de la *"Ley de Organizaciones de Servicios de Salud"*, Artículo 19.010 al 19.270 del Código de Seguros de Puerto Rico, 26 L.P. R.A. secs. 1901-1927.

La U.I.A. es la Unión debidamente certificada desde 1967 por la Junta de Relaciones del Trabajo de Puerto Rico como la representante exclusiva de todos los empleados incluidos en la correspondiente unidad apropiada, a los fines de negociar colectivamente con respecto a salarios, horas de trabajo y otras condiciones de empleo.

La A.A.A. es una corporación pública e instrumentalidad gubernamental autónoma del Estado Libre Asociado de Puerto Rico, creada en virtud de la Ley Núm. 40 de 1 de mayo de 1945, según enmendada, 22 L.P.R. A. sec. 141 *et seq.* La función principal de esta instrumentalidad es establecer y operar los sistemas de acueductos y alcantarillados que forman parte de la infraestructura del Estado. La ley orgánica antes citada, reconoce la facultad de la A.A.A. para negociar convenios colectivos como *"patrono"*.

# II
## EL CONVENIO COLECTIVO Y EL PLAN MÉDICO

El 28 de septiembre de 2000, la U.I.A. y la A.A.A. suscribieron el convenio colectivo que habría de regir sus relaciones obrero-patronales desde el 1 de julio de 1998 hasta el 30 de junio de 2003.

En el Artículo XXXI, sobre la vigencia del convenio, se dispuso lo siguiente.

*"1. Excepto aquellas cláusulas que expresamente disponen su propia vigencia y las que por su naturaleza empezarán a regir cuando se firme el presente convenio, éste estará en vigor desde el 1 de julio de 1998 hasta el 30 de junio de 2003, inclusive, en que expirará.*

*2. En caso que una de las partes desee modificar el convenio colectivo, deberá someter las enmiendas por escrito a la otra ˮ ˷e a más ˳ˬrdar seis (6) meses antes de su vencimiento. De no mediar dicha notificación, se entenderá prorrogado por un año adicional y así sucesivamente. En caso que haya intención de enmendar el convenio, salvo razón de fuerza mayor, la negociación comenzará a más tardar 60 días laborables después de sometidas por escrito las enmiendas."*

En el Artículo XXV se acordó que la A.A.A. aportaría a un plan médico o de salud en beneficio de los empleados unionados.

En lo pertinente dispone dicho artículo:

*"A. Plan de Salud*

*1. La Autoridad conviene en aportar al Plan Médico las siguientes cantidades por cada empleado unionado, para que el empleado, su esposa y sus hijos dependientes menores de 19 años o si continúa como estudiante a tiempo completo hasta los 23 años, disfruten de los siguientes servicios:*

*a. un plan familiar de salud que incluya servicios de hospitalización, médico-quirúrgicos y de dispensario,*

*b. un plan de pago de medicinas,*

*c. un plan dental,*

*d. major medical,*

*e. espejuelos"*

Efectivo a la firma del convenio, la Autoridad continuará aportando al Plan Médico la cantidad de doscientos treinta y dos ($232.00) dólares por cada empleado unionado hasta tanto y en cuanto se resuelva el caso que está ante el Comité de Querellas. Si la decisión del Comité de Querellas no es favorable a la Unión, entonces las partes negociarán esta cláusula durante los siguientes quince (15) días laborables de haberse notificado la resolución del Comité de Querellas.

**Para propósito de este acuerdo, la Autoridad está asumiendo que el Plan Médico cumple plenamente con todos los requisitos impuestos por el Comisionado de Seguros de Puerto Rico.**

La estipulación entre U.I.A. y la A.A.A. del 1 de octubre de 1991 (que requiere que en caso de que ocurra un déficit operacional en el Plan por razones no atribuibles a apropiación ilegal, malversación, mal uso de fondos o negligencia del Administrador del Plan, las partes se reunirán para analizar y resolver el déficit) continuará en vigor sin revisión, excepto por el cambio del 'año fiscal' a 'años naturales', según requerido por la U.I.A.

*"1. (A) La Autoridad remesará directamente a la Unión Independiente Auténtica de Empleados de la Autoridad de Acueductos y Alcantarillados de P.R. en o antes del día 5 de cada mes el importe correspondiente al número de empleados unionados cubiertos mensualmente por el plan el último día del mes anterior; disponiéndose que la Autoridad pagará la aportación completa para los empleados que en o antes del día 15 del mes de que se trate aprueben el período de ingreso. También la Autoridad pagará la aportación completa para aquellos empleados que renuncian o cesan en su empleo después del día 5 del mes de que se trate.*

*...*

*3. La Autoridad queda autorizada a hacer aquellos descuentos individuales del salario de cada empleado que por decisión de los afiliados a la Unión se autorice como aportación individual para el plan familiar de salud, plan de pago de medicinas y/o plan dental.*

*4. Los empleados disfrutarán del plan médico mientras se desempeñen en sus puestos, cuando estén disfrutando de cualquier tipo de licencia con paga o cuando se les haya autorizado licencia sin sueldo con motivo de un accidente del trabajo, por enfermedad del empleado, o porque éste tenga que atender a un familiar directo enfermo, según se define en la Licencia para Funerales de Familiares; disponiéndose que en este último caso se pagará la aportación hasta un máximo de 6 meses.*

*5. La Unión contratará los servicios de un plan médico que esté autorizado por la Oficina del Comisionado de Seguros de Puerto Rico.*

*... "* (Énfasis suplido).

El plan médico contratado por la U.I.A. fue el Plan de Salud de la U.I.A., Inc., la parte demandante en instancia.

En agosto de 2004, la U.I.A. decretó una huelga contra la A.A.A. Luego de varias semanas, las partes llegaron a unos acuerdos, entre los cuales se incluyó uno relacionado con el plan médico. En una *"Estipulación"* de 18 de octubre de 2004, la cual no fue firmada por los representantes de las partes en ese momento, pero fue ratificada y firmada el 28 de diciembre de 2004, se dispuso lo siguiente:

*"A. Plan Médico*

***Las partes aquí comparecientes acuerdan que con relación al Plan Médico U.I.A., Inc. se constituirá una Junta de Directores Interina de dos (2) representantes nombrados por la U.I.A.; dos (2) representantes nombrados por la A.A.A. y un quinto miembro, quien presidirá la Junta. Este quinto miembro, según acordado por las partes, será el Monseñor Roberto González.***

...

***Los unionados seleccionarán libremente el Plan Médico de la UIA Inc. o el Plan Médico Triple S.*** *Ninguna de las partes hará campaña para la selección del Plan Médico. La aportación de primas de la AAA al Plan Médico UIA, Inc. para los empleados que prefieran dicho Plan, comenzará a partir del mes de octubre del 2004. Con relación a las primas correspondientes a los meses que no fueron abonadas.*

*Este acuerdo sobre el Plan Médico continuará en vigor hasta que advengan finales y firmes en los foros pertinentes, los casos E-238 y E-2004-47 que fueron consolidados, y se tramitan ante la Oficina del Comisionado de Seguro."* (Énfasis suplido).

El 28 de diciembre de 2004, la U.I.A. y la A.A.A., representadas por sus principales funcionarios ejecutivos, suscribieron y firmaron un escrito intitulado *"Estipulación"*, donde además de lo relacionado con el plan médico, según antes expuesto, acordaron lo siguiente:

*"1. Plan Médico*

*El Plan Médico será según definido en el Inciso A de la Estipulación discutida por las partes con fecha del 18 de octubre de 2004 y según las disposiciones del Convenio Colectivo correspondientes al Artículo XXV–no modificadas por dicha Estipulación con las siguientes enmiendas mínimas que no cambian la sustancia de lo acordado; (véase anejo 1) ...".*

En el párrafo ⁻ ue dicha estipulación, se estableció la siguiente salvedad:

*"Todos los demás Artículos y disposiciones del Convenio Colectivo que no fueron modificados permanecen según el Convenio Colectivo. De igual forma se mantienen los Artículos y disposiciones que fueron acordados y firmados por las partes durante el proceso de la negociación recogido en la estipulación del 18 de octubre de 2004, así como otros acordados en fecha posterior."*

En el Anejo I a que alude la estipulación de referencia citada, se dispuso lo convenido en la *"Estipulación"* de 18 de octubre de 2004.

En junio de 2005, la U.I.A., la A.A.A. y el presidente del Plan de Salud U.I.A., Inc. suscribieron y firmaron un escrito intitulado *"Documento Aclaratorio"* en el cual convinieron en lo siguiente:

*"1. A tenor con la certificación emitida por la Comisionada de Seguros el 23 de junio de 2005, ésta certifica que las primas del Plan de Salud UIA, Inc. (PSUIA, Inc.) correspondientes a los meses de agosto a diciembre de 2004 son una deuda de la UIA, según Resolución Corporativa firmada por la Junta de Directores de la UIA. La*

*Unión Independiente Auténtica, por la presente, se compromete a asumir el pago de las aportaciones del PSUIA, Inc. correspondiente a los meses de agosto a diciembre de 2004. Lo anterior no podrá interpretarse como una modificación a los términos contenidos en la estipulación firmada entre la AAA y la U.I.A. del 28(29) de diciembre de 2004.*

*De igual forma, la Unión Independiente Auténtica se compromete a asumir cualquier menoscabo al PSUIA, Inc. correspondiente a los meses de enero al 30 de junio de 2005, atribuible a apropiación ilegal, malversación, mal uso de fondos o negligencia del Administrador del Plan, y que surja como resultado de la auditoría que la Oficina del Comisionado de Seguros (OCS) realizará a partir de agosto de 2005. De surgir un menoscabo no atribuible a las razones anteriores, se procederá de conformidad a lo estipulado en el convenio colectivo.*

***Como parte de este compromiso de la Unión Independiente Auténtica, la Autoridad de Acueductos y Alcantarillados remitirá al Plan de Salud UIA las aportaciones correspondientes a los meses de enero a mayo de 2005. La AAA reanudará las aportaciones pendientes al plan del 1 de junio del 2005 en adelante sujeto a los siguientes incisos.***

***a. El Plan someterá no más tarde del 31 de julio de 2005 la información requerida por la Oficina del Comisionado de Seguros (OCS).***

***b. Tan pronto se reciba la certificación sobre la solvencia financiera del Plan, la AAA remitirá al Plan de Salud la aportación correspondiente al mes de junio de 2005.***

***c. De surgir un menoscabo atribuible a las razones expuestas en el inciso 2 y una vez cubierto el mismo, la AAA reanudará las aportaciones mensuales.***

***d. De concluir la auditoría de la OCS sin señalamiento de menoscabo, la AAA reanudará las aportaciones mensuales a partir del 1 de junio de 2005.***

...

*4. Las aportaciones del PSUI, Inc. se computarán a razón de $325 por empleado, por mes según la tarifa promedio única que ha determinado aplicable la OCS. El Plan podrá someter a la OCS una solicitud de Revisión de Tarifa en el momento que lo considere apropiado. La AAA acatará la determinación de la Oficina de la Comisionada de Seguros."* (Énfasis suplido).

### III
## LOS HECHOS QUE PROVOCAN EL LITIGIO

Estando vigentes los acuerdos anteriormente citados, la A.A.A. no satisfizo al Plan sus aportaciones correspondientes a los empleados acogidos al mismo para los meses de junio a noviembre del año en curso.

Sosteniendo haber cumplido con sus acuerdos con la A.A.A., el Plan presentó el 3 de noviembre de 2005 una demanda contra la A.A.A. y la U.I.A., sobre *injunction* preliminar y permanente, así como de sentencia declaratoria. Solicitó al T.P.I. que se le ordenara a las partes demandadas pagar de inmediato al Plan las sumas adeudadas y reclamadas por concepto de aportaciones en beneficio de los empleados acogidos o suscritos al Plan.

El T.P.I. señaló vista de interdicto preliminar para la mañana del 7 de noviembre de 2005, a la cual comparecieron todas las partes representadas por sus respectivos abogados. En una vista inicial, la A.A.A. expuso que estaba solicitando la desestimación de la demanda. Fundamentó su solicitud en que de entenderse que está vigente el convenio colectivo entre la U.I.A. y la A.A.A., la suspensión de las aportaciones del patrono al plan

médico de los empleados, podría constituir una práctica ilícita del trabajo, lo que entonces sería un asunto de la jurisdicción primaria exclusiva de la Junta de Relaciones del Trabajo.

En la alternativa, planteó la A.A.A., que de determinarse la inexistencia de un convenio colectivo, el T.P.I. carece de jurisdicción para expedir orden de entredicho, interdicto preliminar o permanente, por tratarse de una disputa obrero-patronal a la cual le es aplicable la Ley Núm. 50 de 4 de agosto de 1947, 29 L.P.R.A. sec. 121, que prohíbe la concesión de dichos remedios extraordinarios en disputas laborales.

Estudiados los planteamientos de las partes sobre la desestimación solicitada, el T.P.I. denegó la misma, disponiendo que:

*"Resolvemos que por exigirse el cumplimiento de una obligación contractual asumida por un patrono y una unión en relación a los servicios de un plan de salud que presta un tercero a los empleados miembros de las dos partes antes mencionadas, la acción que nos ocupa no es de la jurisdicción de la J.R.T. Tampoco es de aplicabilidad a la controversia la Ley Núm. 50, supra, por no ser la demandante en el contexto de este pleito un patrono ni un empleado ni una organización obrera."* (Véase Resolución recurrida, a la pág. 3.)

El T.P.I. celebró entonces una vista evidenciaria para atender la solicitud de interdicto preliminar. Ésta se efectuó en la tarde de ese mismo día 7 de noviembre. A dicha vista comparecieron todas las partes representadas por sus respectivos abogados.

La representación legal de la A.A.A. reprodujo sus argumentos para fundamentar la moción de desestimación previamente radicada. La esencia de lo expuesto por la A.A.A. consistió en que el T.P.I. no tenía jurisdicción para entender en el asunto, ya que dicha jurisdicción correspondía a la Junta de Relaciones del Trabajo en virtud de que las alegaciones de la demanda contra la A.A.A. esencialmente constituian la imputación de una práctica ilícita dentro de una disputa obrero patronal.

Por su parte, la representación legal del Plan expuso que lo reclamado no constituia una disputa obrero-patronal, ya que el plan es una corporación con personalidad jurídica independiente de la U.I.A. y que, además, no se trata la reclamación de un empleado de contra la A.A.A. Por tanto, sostuvo que no tratándose de una disputa obrero patronal, la controversia podía ser atendida por el foro judicial.

Planteó también el Plan que los acuerdos entre las partes relacionados con el plan médico y las aportaciones de la A.A.A., habían sido cumplidos por el Plan, circunscribiéndose, por ende, la disputa a una de incumplimiento contractual por r᷄   ᷄ de la A.A.A.

A los fines de cumplir con los requisitos normativos pertinentes al interdicto solicitado, el Plan presentó prueba testifical. El Sr. Héctor Orlando Ramos, Administrador del Plan, nombrado por la nueva Junta de Directores constituida por acuerdo entre el Plan y la A.A.A., declaró que la Oficina del Comisionado de Seguros de Puerto Rico no había encontrado ningún menoscabo en la situación financiera del Plan, aunque admitió que los estados financieros reflejaban un exceso de pasivos sobre los activos. Sostuvo que el Plan lleva varios meses en que no ha recibido las aportaciones de la A.A.A., situación que le ha llevado a adeudar a los proveedores los servicios que prestan. Del Plan no poder cumplir con el pago a los proveedores, *"se autodestruiría"*. Véase página 76 de la Transcripción de la vista evidenciaria.

Puntualizó el testigo que la A.A.A. debe pagar mensualmente $325.00 dólares por cada unionado; además, que el Plan ha funcionado por treinta años, manteniendo una buena relación con sus proveedores. Actualmente no hay flujo de efectivo, por lo que no le están pagando a los proveedores. El único medio de financiamiento del plan para los empleados de la A.A.A. son las aportaciones que ésta hace. Además, la U.I.A., por su parte, adeuda al Plan la suma de $2,659,000.00, lo que también es objeto de reclamación.

A la terminación de la vista evidenciaria, el planteamiento final de la representación legal de la A.A.A. fue que se requiera al Plan la presentación de una fianza adecuada por ser un requisito para dictar un interdicto preliminar.

Así las cosas, el 9 de noviembre de 2005, con notificación a las partes ese mismo día, el T.P.I. dictó la resolución de la cual se recurre.

## IV
## LAS CUESTIONES PLANTEADAS

En su solicitud para que expidamos auto de *certiorari*, la A.A.A. señala cuatro errores en la resolución de la cual se recurre, a saber:

*"1. ERRÓ EL T.P.I. AL NO DESESTIMAR LA DEMANDA DEL CASO DE EPÍGRAFE, YA QUE DE SU FAZ SURGE QUE LO PLANTEADO ES UN ASUNTO CLARAMENTE DEFINIDO COMO PRÁCTICA ILÍCITA DEL TRABAJO BAJO LA LEY DE RELACIONES DEL TRABAJO, SUPRA; POR ENDE LA JURISDICCIÓN PRIMARIA EXCLUSIVA DEL ASUNTO PLANTEADO LE COMPETE A LA JUNTA DE RELACIONES DEL TRABAJO.*

*2. ERRÓ EL T.P.I. AL NO DESESTIMAR LA SOLICITUD DE INTERDICTO PRELIMINAR PRESENTADA POR LA PARTE DEMANDANTE CONTRARIO A LO QUE ESTABLECE LA LEY NÚM. 50 DEL 4 DE AGOSTO DE 1947, LA CUAL PROHÍBE QUE EMITA UN INJUNCTION O ENTREDICHO PROVISIONAL CUANDO SE TRATA DE UNA DISPUTA OBRERO-PATRONAL, 29 L.P.R.A. SEC. 1001-109.*

*3. ERRÓ EL T.P.I. AL DETERMINAR QUE EL DAÑO IRREPARABLE, SI ALGUNO, QUE PUEDA TENER EL PLAN U.I.A. ES RESPONSABILIDAD DE LA A.A.A., A PESAR DE QUE ESTA ÚLTIMA NO TIENE NINGÚN TIPO DE OBLIGACIÓN, CONTRACTUAL O LEGAL, PARA CON DICHA ENTIDAD.*

*4. ERRÓ EL T.P.I. AL NO CUMPLIR CON EL DEBIDO PROCESO DE LEY DE NOTIFICACIÓN PREVIA A UNA PARTE ANTES DE PROCEDER CON LA VISTA EVIDENCIARIA."*

Los primeros tres errores podrían contraerse y delimitarse a las siguientes controversias y a sus posibles soluciones:

Si las alegaciones vertidas en la demanda constituyen ciertamente una imputación a la A.A.A. de incurrir en una práctica ilícita del trabajo, dentro de una disputa obrero-patronal, procedería entonces dictaminar que la jurisdicción primaria exclusiva para atender el asunto reside en la Junta de Relaciones del Trabajo. Además, que conforme a la Ley Núm. 50 de 4 de agosto de 1947, de ordinario, ningún tribunal de justicia tiene jurisdicción para expedir una orden interdictal -para prohibir o hacer determinados actos identificados en dicho estatuto- en aquellos casos que envuelvan o surjan de una disputa obrero patronal. 29 L.P.R.A. sec. 102.

Si la controversia entre el Plan y la A.A.A. no constituye una disputa obrero-patronal *bona fide*, sujeta a la jurisdicción de la J.R.T. -por tratarse de una reclamación por incumplimiento de un contrato, dirigida a proteger intereses privados o independientes-, puede entonces la misma ser atendida y adjudicada por los tribunales.

En consecuencia, tendríamos que determinar si a la luz de los criterios normativos para conceder remedios interdictales, en ausencia de otro remedio más eficaz para vindicar el derecho que se persigue proteger, el T.P.I. actuó correctamente al decretar el *injunction* preliminar aquí cuestionado.

El cuarto error se circunscribe a determinar si el T.P.I. garantizó a la A.A.A. el debido proceso de ley antes de acceder al remedio interdictal decretado.

## V
## EL DERECHO PERTINENTE Y APLICABLE

Ante las controversias y planteamientos que las partes han traído a la consideración de este tribunal, debemos exponer con adecuada precisión los criterios normativos dentro de los cuales procede que enmarquemos los mismos.

## A
## La Cuestión Jurisdiccional

En Puerto Rico existe un interés apremiante del Estado en regular las relaciones obrero-patronales, que se enmarca dentro de una política pública dirigida a proteger los derechos de los trabajadores. *Rivera v. Pan Pepín, Inc.,* 161 D.P.R. __ (2004), **2004 J.T.S. 68**. Esta política pública deriva de que los derechos fundamentales de los trabajadores están particularmente reconocidos en la Constitución del Estado Libre Asociado de Puerto Rico. *Ortiz v. Mun. de Lajas,* 153 D.P.R. ___ (2001), **2001 J.T.S. 51**.

A base de lo anterior es que nuestra legislación ha dado importancia suprema a la dilucidación de los conflictos o disputas entre obreros y patronos. Desde hace 60 años, nuestra Asamblea Legislativa aprobó la Ley de Relaciones del Trabajo, Ley Núm. 130 de 8 de mayo de 1945, según enmendada, 29 L.P.R.A. secs. 41 a 76, en adelante Ley Núm. 130.

En el Artículo 2 de la Ley Núm. 130, *supra*, 29 L.P.R.A. sec. 63(6), al definir lo que constituye una *"disputa obrera"* se dispuso lo siguiente:

*"Incluye cualquier controversia relativa a los términos, tenencia o condiciones de empleo o en relación con la organización o representación de empleados o sobre negociación, fijación, mantenimiento, cambio o esfuerzo para convenir términos o condiciones de empleo, estén o no los disputantes en la relación inmediata de patrono y empleado."*

Para atender las disputas obrero-patronales, en el Artículo 3 de la Ley Núm. 130, *supra*, 29 L.P.R.A. sec. 64, se creó una agencia administrativa especializada en la materia denominada Junta de Relaciones del Trabajo, en adelante J.R.T.

La jurisdicción de la J.R.T. en controversias relacionadas con prácticas ilícitas de patronos y uniones, según definidas en el Artículo 8 de la Ley Núm. 130, *supra*, 29 L.P.R.A. sec. 69, es exclusivamente de dicha agencia. *F. S.E. v. J.R.T.,* 111 D.P.R. 505 (1985).

La A.A.A. invoca la aplicación a los hechos en controversia del Artículo 8(1)(k) de la Ley Núm. 130, *supra*, 29 L.P.R.A. sec. 69(1)(k). Dicho artículo define como práctica ilícita en que puede incurrir un patrono, el que:

*"(k) Suspenda o demuestre la intención de suspender los pagos por concepto de seguros y planes médicos de los empleados y dependientes de éstos, mientras se esté negociando un nuevo convenio colectivo o durante una huelga, siempre que haya mediado previamente una petición escrita al patrono por parte de la unión que los representa para que aquél continúe efectuando los referidos pagos."*

Lógicamente corresponde a la organización obrera ejercitar esta causa de acción contra el patrono en el foro administrativo.

Dentro del mismo contexto de política pública, dos años después de aprobada la Ley Núm. 130, *supra*, la Asamblea Legislativa aprobó la Ley Núm. 50 de 4 de agosto de 1947, en adelante Ley Núm. 50, 29 L.P.R.A. secs. 101-109. ■ Este estatuto va dirigido a prohibir a los tribunales expedir órdenes de entredicho o de *injunction* en casos de huelgas o disputas obrero-patronales. Solamente permite expedir dichas órdenes en aquellos conflictos donde se den ciertas circunstancias particularmente definidas. Véase *P.R.T.C. v. Unión Indep. Emp. Telefónicos*, 131 D.P.R. 171 (1992).

Antes de que se aprobara en 1932 en los Estados Unidos la llamada Ley Norris-La Guardia, 29 U.S.C.A. sec. 101 *et seq.*, y en Puerto Rico la Ley Núm. 50, *supra*, se utilizaron acciones interdictales en los tribunales para entorpecer y restringir a las uniones obreras en el ejercicio de sus derechos. Esta legislación fue necesaria *"para remediar la enorme desventaja en que se encontraban los obreros cuando luchaban por sus derechos"*. ■ Los propósitos fueron evitar *"las distintas prácticas a que fueron sometidos los obreros cuando las cortes de justicia respaldaban las peticiones de los patronos."* ■

En el Artículo 2, de la Ley Núm. 50, *supra*, 29 L.P.R.A. sec. 102, se establece taxativamente que los tribunales en Puerto Rico no pueden expedir órdenes interdictales, *"en caso alguno que envuelva o que surja de una disputa obrera"* para prohibirle a alguna persona, participante o interesada en dicha disputa a que haga determinados actos. Entre los actos que conforme a esta disposición no pueden ser objeto de prohibición interdictal está el siguiente:

*"(c) Pagarle, darle o retenerle a cualquier persona participante o interesada en dicha disputa obrera, cualesquiera beneficios, seguro de huelga, u otro dinero o casa de valor."*

Con esta disposición se pretende evitar que los tribunales intervengan en actos legítimos que llevan a cabo los obreros y las organizaciones que los agrupan en el ejercicio de sus derechos durante conflictos obrero-patronales. A la luz de este artículo, así como lo dispuesto en el Artículo 3 de la Ley Núm. 50, *supra*, 29 L.P.R.A. sec. 103, todo lo que una organización obrera o sus miembros hagan en el reclamo de sus derechos, sin fraude ni violencia y sin que constituya conspiración ilegal, no puede ser restringido por los tribunales. Se prohíbe en las acciones las ordenes interdictales que puedan entorpecer o menoscabar las actividades legítimas de los obreros.

La Ley Núm. 50, *supra*, en su Artículo 9, 29 L.P.R.A. sec. 109, define una disputa obrero-patronal en los siguientes términos:

*"(a) Se considerará que un caso envuelve o surge de una disputa obrera cuando dicho caso envuelve a personas dedicadas a la misma industria, oficio, arte manual u ocupación; o que tienen interés directo o indirecto en los mismos; o que sean empleados del mismo patrono; o miembros de la misma organización de empleados o patronos, o de alguna organización afiliada a la misma; bien sea dicha disputa:*

*(1) Entre uno o más patronos o asociaciones de patrono y uno o más empleados o asociaciones de empleados;*

*(2) entre uno o más patronos o asociaciones de patronos y uno o más patronos o asociaciones de patronos, o;*

*(3) entre uno o más empleados o asociaciones de empleados y uno o más empleados o asociaciones de empleados; o cuando el caso envuelve cualesquiera intereses conflictivos o en pugna en una disputa obrera de personas participantes o interesadas en la misma.*

*(b) Se considerará que una persona o asociación es participante o está interesada en una disputa obrera si se solicita recurso contra dicha persona o asociación, o si cualquiera de éstas se dedica a la misma industria,*

*oficio, arte manual u ocupación en que ocurra dicha disputa, o tiene interés directo o indirecto en la misma, o es miembro, funcionario o agente de cualquier asociación compuesta total o parcialmente de patronos o empleados dedicados a tal industria, oficio, arte manual u ocupación.*

*(c) El término disputa obrera incluye cualquier controversia relativa a término o condiciones de empleo o relativa a la asociación o representación de personas al negociar, fijar, mantener, cambiar, o tratar de llegar a un acuerdo sobre términos o condiciones de empleo, aunque las partes se encuentren o no en la relación inmediata de patrono y empleado."*

Al pronunciarse sobre el concepto de lo que es una disputa obrero-patronal, nuestro Tribunal Supremo puntualizó que *"[c]iertamente algunas situaciones conflictivas entre obreros y patronos presentan una imbricación de derechos y remedios en conflicto, que necesita, de entrada, la dilucidación del foro que debe asumir jurisdicción, si es judicial o administrativo."* P.R.T.C. v. Unión Indep. Emp. Telefónicos, *supra*, págs. 188-189.

La disyuntiva antes expuesta implica que *"[l]a clave está en determinar la esencia y naturaleza de la actividad que los obreros llevan a cabo. Si por su naturaleza la actividad directamente se relaciona con los derechos protegidos por el estatuto y por su esencia está enmarcada dentro de un conflicto obrero patronal, la actividad será protegida por la Ley de Relaciones del Trabajo de P.R. y corresponderá a la Junta [de Relaciones del Trabajo] asumir jurisdicción exclusiva, sin afectar dicha jurisdicción ningún otro medio de ajuste o prevención, salvo en circunstancias especiales."* Artículo 7(a) de la Ley Núm. 130, *supra*, 29 L.P.R.A. sec. 68(a). *Id.*

La propia Ley Núm. 50, *supra*, por vía de excepción, autoriza a los tribunales de Puerto Rico a asumir jurisdicción para expedir una orden interdictal, aun cuando se trate de una disputa obrero-patronal, siempre y cuando se den determinadas situaciones. A estos fines dispone el Artículo 5, 29 L.P.R.A. sec. 105, las siguientes situaciones de excepción:

*"(a) Que se ha amenazado cometer y se cometerán actos de fraude o violencia, a menos que se impidan o se han cometido y continuarán cometiéndose dichos actos a menos que se impidan, pero no se expedirá ningún injunction ni orden de entredicho temporal con motivo de amenaza o acto alguno de fraude o violencia excepto contra la persona o personas o la asociación u organización que hiciere la amenaza o cometiere el acto de fraude o violencia o que realmente autorizare dicho acto después de tener conocimiento real del mismo;*

*(b) que habr´  ue resultar uaños sustanciales e irreparables a la propiedad física del querellante;*

*(c) que en cuanto al remedio solicitado para cada alegación resultaría mayor perjuicio para el querellante negándosele el remedio que el que habría de resultar para los querellados si se concediera el remedio;*

*(d) que el querellante no tiene ningún otro recurso adecuado en derecho; y*

*(e) que los funcionarios públicos encargados del deber de proteger la propiedad del querellante no pueden o no están dispuestos a proporcionar la protección adecuada."*

Estas excepciones están dirigidas a proteger a los patronos y empleados no en huelga que deseen trabajar de actividades ilegales por parte de las organizaciones o asociaciones con ellos en disputa. Se permite la intervención judicial con el propósito de asegurar que el conflicto obrero-patronal se conduzca en forma pacífica y ordenada, sin que se afecte el orden público. Véase *El Imparcial, Inc. v. Brotherhood, etc.,* 82 D.P.R. 164, 188 (1962).

Este tipo de interdicto sólo podrá conseguirlo el patrono a través de los tribunales si la conducta que se

observa de la unión es de naturaleza violenta y no existe otro medio para controlarla que no sea recurso de *injunction*. Se ha sostenido que la aplicación de la llamada *"Ley de Injunction"* en disputas obreras debe examinarse cada caso en particular para determinar si se cumplen los requisitos de la ley para expedir el interdicto. Fernández Quiñones, *ob cit.* págs. 343-344.

De otro lado, nuestro Tribunal Supremo ha enunciado que si la única controversia presentada en un recurso ante los tribunales gira en torno a si el patrono ha incurrido o no en una practica ilícita de trabajo, solamente estaría envuelto un derecho público y la J.R.T. tendría jurisdicción exclusiva. Pero, que la jurisdicción exclusiva de la J.R.T. para proteger el derecho público afectado por un conflicto obrero-patronal, no impide necesariamente que los empleados inicien pleitos en los tribunales con el fin de proteger sus intereses privados. *Asoc. de Guardianes v. Bull Line,* 78 D.P.R. 714, 720 (1955). Puntualizó el más Alto Foro en este caso que *"[n]o creemos que la Asamblea Legislativa tuvo el propósito de impedir tales pleitos privados cuando como en el presente la Junta no ha tomado acción alguna en conexión con el derecho público envuelto ...". Id.* (Énfasis suplido).

En *Asoc. de Guardianes v. Bull Line, supra,* se trataba de dos obreros despedidos por el patrono. La cuestión del despido fue sometida a un Comité de Arbitraje. Los miembros del comité requirieron de los obreros que firmaran un acuerdo de sumisión, como requisito previo para proceder a atender el arbitraje. Los miembros del comité que representaba a la unión se negaban a dicho requerimiento, razón por la cual el comité en pleno denegó el arbitraje. Los dos obreros despedidos instaron demanda en los tribunales contra el patrono y la mayoría de los miembros del comité que negaron el arbitraje.

Al resolver que los obreros tenían derecho a recurrir al tribunal para que allí se determinara, vía sentencia declaratoria, si era necesario o no que se le sometiera un convenio de sumisión, el más Alto Foro afirmó que una de las cláusulas del convenio colectivo establecía que el asunto podía someterse a un Comité de Arbitraje; y, que existiendo disparidad de criterio entre los miembros del comité respecto a las relaciones jurídicas derivadas de una de las cláusulas del convenio, ellos tenían derecho a acudir al foro judicial para que se dirimiera la controversia.

En la jurisdicción federal se ha sostenido el siguiente principio: *"Not every activity of a labor organization, not even every controversy in which it may become involved, is a 'labor dispute' within the statutory meaning." N.L.R.B. v. International Longshoremen's Association,* 332 F.2d 992, 995-996 (4th Cir. 1964); *N.L.R.B. v. Miranda Fuel Co.,* 326 F. 2d 172, 180 (2d Cir. 1963). (Énfasis suplido).

**-B-**
## Principios Generales del Recurso de Interdicto o *Injunction*

Se ha sostenido que el principio fundamental que rige el remedio extraordinario de interdicto, es la existencia de una amenaza real de sufrir algún daño para el cual no se tiene un remedio adecuado en ley. De ahí, que mientras exista algún remedio eficaz, completo y adecuado en ley, no se considera el daño como irreparable, Véase 11 Wright and Miller, *Federal Practice and Procedure: Civil,* 2d Sec. 2942 (1983); *Martínez v. P.R. Ry. Light & Power Co.,* 18 D.P.R. 725 (1912); *Franco v. Oppenheimer,* 40 D.P.R. 153 (1929).

La determinación de lo que constituye un remedio adecuado en ley y si se está ante un daño irreparable depende de los hechos y circunstancias de cada caso en particular. *A.P.P.R. v. Tribunal Superior,* 103 D.P.R. 903-906 (1975); *Smith v. Western Elec. Co.,* 643 S.W.2d 10 (1982); *Chardón v. Laffaye,* 43 D.P.R. 650 (1932); *Loíza Sugar Company v. Hernaiz y Albandoz,* 32 D.P.R. 903 (1924) *Martínez v. P.R. Ry. Light & Power Co., supra;.* Véase, además, D. Rivé Rivera, *El Injunction en Puerto Rico,* 53 (núms. 2-3) Rev. Jur. U.P.R. 341, 346-347 (1984).

El concepto de daño irreparable ha sido definido desde tiempo inmemorial como aquel daño que no puede ser

ampliamente compensado en una acción por daños y perjuicios. *González v. Collazo*, 14 D.P.R. 855, 859 (1908). El elemento decisivo para determinar la irreparabilidad del daño es el de si una compensación monetaria constituiría un remedio tan completo, rápido y adecuado como el remedio de interdicto para vindicar los derechos del demandante.

El mero hecho que lo que esté en controversia sea una reclamación monetaria no excluye definitivamente el remedio de *injunction,* si el mismo es necesario para mantener el *status quo* e impedir que por el mero pasar del tiempo el demandante se quede sin un remedio efectivo, así como para proteger un derecho propietario amenazado por un inminente acto ilegal del demandado. *Mun. de Ponce v. Gobernador,* 136 D.P.R. 776, 784 (1994).

En resumen, la concesión o no de un *injunction* preliminar, como se planteó en el caso ante nuestra consideración, debe determinarse a la luz de los criterios enunciados por el Tribunal Supremo en *Mun. de Ponce v. Gobernador, supra; P.R. Telephone Co. v. Tribunal Superior,* 103 D.P.R. 903 (1975). Estos criterios son los siguientes:

*"(1) la naturaleza de los daños que pueden ocasionárseles a las partes de concederse o denegarse el injunction;*

*(2) su irreparabilidad o la existencia de un remedio adecuado en ley;*

*(3) la probabilidad de que la parte promovente prevalezca eventualmente al resolverse el litigio en su fondo;*

*(4) la probabilidad de que la causa se torne académica de no concederse el injunction; y sobre todo,*

*(5) el posible impacto sobre el interés público del remedio que se solicita."*

### -C-
### La Libertad de Contratación y la Buena Fe Contractual

### (1)

Nuestro Tribunal Supremo ha reiterado en numerosas ocasiones que en nuestra jurisdicción rige el principio de libertad de contratación, mediante el cual los contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que las mismas no sean contrarias a las leyes, a la moral, ni al orden público. Art. 1207 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3372; *Álvarez de Choudens v. Rivera,* 163 D.P.R. ____ (2005), **2005 J.T.S. 90**; *SLG v. SLG,* 155 D.P.R. ___ (2001), **2001 J.T.S. 164**.

Además, nuestro ordenamiento reconoce el principio de que las obligaciones que nacen de los contratos tienen fuerza de ley entre las partes. Artículo 1044 del Código Civil, 31 L.P.R.A. sec. 2994; *Álvarez de Choudens v. Rivera, supra; Bauzá v. García López,* 129 D.P.R. 579, 593 (1991).

En materia de negociación colectiva es doctrina reiterada por nuestro Tribunal Supremo que un convenio colectivo es un contrato que tiene fuerza de ley entre las partes. *Corp. P.R. Dif. Pub. V. U.G.T.,* 156 D.P.R. ___ (2002); **2002 J.T.S. 60**; *Vélez Miranda v. Servicios Legales de Puerto Rico,* 144 D.P.R. 673, 682 (1998); *J.R.T. v. Junta Adm. Muelle Mun. de Ponce,* 122 D.P.R. 318 (1988).

Nuestra jurisprudencia ha reconocido que dado un convenio colectivo válido, el mismo es obligatorio para la unión y sus miembros, así como también para el patrono. *Rivera Adorno v. Autoridad de Tierras,* 83 D.P.R. 258, 264 (1961).

También es principio normativo que la validez y el cumplimiento de los contratos no pueden dejarse al arbitrio de uno de los contratantes. Artículo 1208 del Código Civil, 31 L.P.R.A. sec. 3373.

Debemos señalar, también, que la buena fe en la contratación se presume. *Citibank v. Dependable Ins. Co.,* 121 D.P.R. 503 (1988). Al momento de interpretar un contrato es preciso presuponer lealtad, corrección y buena fe en su redacción, e interpretarlo de manera tal que lleve a resultados conformes a la relación contractual y que estén de acuerdo con las normas éticas. Dicho en otras palabras, no se puede buscar oscuridad ni tergiversar la interpretación de los contratos para llegar a resultados absurdos o injustos. *SLG v. SLG, supra; Citibank v. Dependable Ins. Co., supra.*

## (2)

En nuestra jurisdicción se ha adoptado la llamada doctrina de los actos propios. Con esta doctrina se establece que a nadie le es lícito ir contra los propios actos. Su fundamento y raíz es el principio general de Derecho que ordena proceder de buena fe en la vida jurídica. La conducta contradictoria no tiene cabida en el ámbito jurídico, por lo que debe ser impedida.

Como el principio de *"ir contra los propios actos"* es uno de derecho, en Puerto Rico su validez nace de lo dispuesto en el Artículo 7 del Código Civil, 31 L.P.R.A. sec. 7, el cual instruye para que en ausencia de ley aplicable al caso, el tribunal resuelva de acuerdo con la equidad, que quiere decir que se tendrá en cuenta la razón natural de acuerdo con los principios generales de derecho, y los usos y costumbres aceptados y establecidos. Con este principio se busca proteger la confianza depositada en la apariencia, que es por extensión protección de un interés social o la consecución de un ideal de justicia.

Nuestro Tribunal Supremo se ha pronunciado en que los presupuestos necesarios o elementos constitutivos para la aplicación del principio o norma de que nadie puede ir contra sus propios actos puede contraerse a lo siguiente: *"(a) Una conducta determinada de un sujeto, (b) que haya engendrado una situación contraria a la realidad, esto es, aparente y, mediante tal apariencia, susceptible de influir en la conducta ante los demás, y (c) que sea base de la confianza de otra parte que haya procedido de buena fe y que, por ello, haya obrado de una manera que le causara un perjuicio si su confianza quedara defraudada." Corraliza Rodríguez, v. Banco de Desarrollo Económico,* 153 D.P.R.___ (2001), **2001 J.T.S. 5**; *Rodríguez Oyola v. Machado Díaz,* 136 D.P.R. 250, 256 (1994); *Meléndez Piñeiro v. Levitt & Sons P.R.,* 129 D.P.R. 521, 555 (1991); *Int. General Eletric v. Concrete Builders,* 104 D.P.R. 871, 877-878 (1976).

## -D-
## La Personalidad Jurídica de las Entidades Corporativas

## (1)

Como una de las alegaciones que hace la A.A.A. en una de sus comparecencias ante este foro es que *"no existe una independencia administrativa entre Plan U.I.A. y la U.I.A.,"* es pertinente que reconozcamos el derecho aplicable a las personas jurídicas en circunstancias como las alegadas por la A.A.A. ■

Es originaria norma del derecho corporativo que una corporación tiene su propia personalidad jurídica y su propio patrimonio, distintos a la personalidad y al patrimonio de sus accionistas -que en el caso de las corporaciones sin fines de lucro son los miembros que la componen-, sean estos últimos personas naturales o jurídicas. Artículo 1.01 de la Ley General de Corporaciones de 1995, 14 L.P.R.A. sec. 2601. *D.A.C.O. v. Alturas de Florida Development Corp.,* 132 D.P.R. 905, 924 (1993); *Sucn. Santaella v. Srio. de Hacienda,* 96 D.P.R. 442, 451 (1968); *Sucn. Pérez v. Gual,* 76 D.P.R. 959, 963 (1954); *Swiggett v. Swiggett, Inc.,* 55 D.P.R. 76, 83 (1939).

Es un principio normativo reiterado que los tribunales pueden descartar la personalidad jurídica de una corporación, sujetando a sus accionistas o miembros para responder por las deudas y obligaciones de la misma, en aquellos casos en los cuales se pruebe que la corporación es meramente un *alter ego* o conducto o instrumento económico pasivo de sus únicos accionistas o miembros, y son éstos los que exclusiva y personalmente reciben los beneficios producidos por la gestión corporativa. Esta determinación debe hacerse cuando sea necesario para evitar un fraude o la realización de un propósito ilegal o para evitar una clara inequidad o mal. *D.A.C.O. v. Alturas de Florida Development Corp., supra; Fleming v. Toa Alta Develop. Corp.*, 96 D.P.R. 240, 244 (1968); *San Miguel Fértil Corp. v. P.R. Drydock*, 94 D.P.R. 424, 430 (1967); *J.E. Candal & Co. v. Rivera*, 86 D.P.R. 508, 513 (1962).

De acuerdo con estos principios, una corporación es el *alter ego* o conducto económico pasivo de sus accionistas, y en el caso de corporaciones sin fines de lucro de los miembros que la organizan y operan, cuando entre éstos y la corporación existe tal identidad de interés y propiedad que las personalidades de la corporación y de los accionistas o miembros se hallan confundidas, de manera que la corporación no es, en realidad, una persona jurídica independiente y separada.

Para *"descorrer el velo corporativo"* entre la corporación y sus accionistas o miembros se requiere la presentación de evidencia suficiente que justifique la imposición de responsabilidad mas allá del ente corporativo a los directores, oficiales o accionistas o miembros de la corporación. Véase, *Srio. D.A.C.O. v. Comunidad San José Inc.*, 130 D.P.R. 782, 798 (1992); *San Miguel Fértil Corp. v. P.R. Drydock, supra.*

(2)

Por tratarse el Plan de una organización de servicios de salud, debidamente certificada por la Oficina del Comisionado de Seguros de Puerto Rico, a tenor con la Ley Núm. 113 de 2 de junio de 1976, conocida como *"Ley de Organizaciones de Servicios de Salud"*, 29 L.P.R.A. secs. 1901-1927, le son aplicables todas las disposiciones de dicho estatuto. ■

El Artículo 19.020 del Código de Seguros, 29 L.P.R.A. sec. 1902, le reconoce una personalidad jurídica especial a las llamadas organizaciones de servicios de salud. De acuerdo con la ley, estas organizaciones son reglamentadas y fiscalizadas por el Comisionado de Seguros de Puerto Rico y también están sujetas a inspecciones por el Secretario de Salud. Para poder operar tienen que recibir del Comisionado de Seguros, luego de cumplir con un número considerable de requisitos, *"un certificado de autoridad"*. Véase Artículo 19.040, 29 L.P.R.ᴬ ˋ ᴾ904.

-E-
## El Debido Proceso de Ley

Nuestro ordenamiento jurídico descansa en el principio que todo proceso debe satisfacer los requisitos del debido proceso de ley, el cual incluye lo siguiente: 1) la notificación adecuada de la reclamación que se presenta; 2) que se lleve a cabo ante un juez imparcial; 3) la oportunidad de ser oído; 4) el derecho a contrainterrogar de manera efectiva los testigos que se presenten y rebatir la prueba en su contra; 5) que la decisión se fundamente en el récord judicial; y 6) el derecho a estar representado por abogado. *Álvarez v. Arias*, 156 D.P.R. __ (2002), **2002 J.T.S. 37.**

Es principio fundamental del debido proceso de ley, el deber de otorgar a un individuo el derecho a ser oído antes de que sea despojado de un interés protegido, excepto en aquellas situaciones en que existan circunstancias extraordinarias. *Rodríguez v. Stowell Taylor*, 133 D.P.R. 881, 888-889 (1993).

Ahora bien, nuestro más Alto Foro ha resuelto que cuando hay una privación de un derecho o interés

propietario:

"[...] basta que en algún momento significativo u oportuno el afectado tenga la oportunidad de defenderse y presentar su caso en un proceso con adecuadas garantías." *Vélez Ramírez v. Romero Barceló*, 112 D.P.R. 716, 730 (1982). (Casos citados.)

### -F-
### La Apreciación de la Prueba

Es norma reiterada que las determinaciones de hechos y la adjudicación de credibilidad que hace un tribunal de primera instancia son merecedoras de gran deferencia por parte de los tribunales apelativos. Un tribunal apelativo, de ordinario, no debe intervenir con las determinaciones de hechos ni con la adjudicación de credibilidad que ha hecho el juzgador de los hechos, salvo que haya mediado, pasión, prejuicio, parcialidad o error manifiesto. *Álvarez de Choudens v. Rivera Vázquez, supra; López Delgado v. Cañizares*, 163 D.P.R. ___ (2004), **2004 J.T.S. 165**; *Hernández v. San Lorenzo Construction*, 153 D.P.R. ___ (2001), **2001 J.T.S. 22**; *Rolón v. Charlie Rental*, 148 D.P.R. 420, 433 (1999); *Huertas v. Cía. Fomento*, 147 D.P.R. 12, 31 (1998).

En nuestro ordenamiento jurídico impera la norma de que un tribunal apelativo sólo intervendrá con las determinaciones interlocutorias procesales del tribunal de instancia, cuando éste haya incurrido en arbitrariedad o en un claro abuso de discreción. *García Rubiera v. Asoc. de Suscripción Conjunta*, 163 D.P.R. ___ (2005), **2005 J.T.S. 108**; *Meléndez Vega v. Caribbean Intl. News*, 151 D.P.R. 649, 664 (2000); *Lluch v. España Service Sta.*, 117 D.P.R. 729, 745 (1986); *Valencia, Ex parte*, 116 D.P.R. 909, 913 (1986); *Ortiz Rivera v. Agostini*, 92 D.P.R. 187, 193 (1965).

### VI
### ANÁLISIS Y CONCLUSIONES

El T.P.I., luego de evaluar la prueba testifical y documental que desfiló ante sí, así como de oír las argumentaciones de las partes, consideró los hechos particulares del caso y determinó que procedía el *injunction* preliminar contra la parte demandada, aquí peticionaria. Debemos pues determinar, en atención a los errores señalados y a la luz de los criterios normativos anteriormente expuestos, si el T.P.I. actuó contrario a derecho o si abusó de su discreción al sopesar los intereses en juego y emitir la orden interdictal.

### -A-
Examinemos en primer término si las alegaciones de la demanda instadas por el Plan, como alega la A.A.A., constituyen una imputación de una práctica ilícita del trabajo dentro de una disputa obrero-patronal *bona fide*.

No hemos encontrado nada en los autos ante nuestra consideración que nos convenza de que el Plan y la U. I.A. son un mismo ente organizacional y administrativo, como sostiene la A.A.A. La Ley General de Corporaciones, *supra*, y la Ley de Organizaciones de Servicios de Salud, *supra*, le reconocen al Plan una personalidad jurídica separada e independiente de la U.I.A.

La A.A.A. no presentó ante el T.P.I. prueba que sustentara dicha alegación. Tuvo la oportunidad de hacerlo en la vista celebrada y no lo hizo. A esto debemos añadir que cuando en junio de 2005, la U.I.A., la A.A.A. y el Plan suscribieron el llamado *"Documento Aclaratorio"*, en el cual se requirió la firma del Presidente de la nueva Junta de Directores del Plan, la A.A.A. aceptó *sub silentio* la personalidad jurídica independiente del Plan. Al así actuar renunció a cuestionarla, en ausencia de presentación de prueba suficiente en contrario. Véase *D.A.C. O. v. Alturas de Florida Development Corp., supra; Srio. D.A.C.O. v. Comunidad San José, Inc., supra; Fleming v. Toa Alta Develop. Corp., supra; San Miguel Fértil Corp. v. P.R. Drydock, supra; J.E. Candal & Co.*

*v. Rivera, supra.*

Dictaminado lo antes expuesto, somos de opinión que el Plan por ser un ente corporativo separado de la U. I.A. y dada la naturaleza de la reclamación instada, no tiene causa alguna para presentar una querella por práctica ilícita contra la A.A.A. en la J.R.T. Además, el derecho no puede consagrar absurdos. Esto ocurría si aceptáramos la tesis subyacente de la A.A.A., de que un patrono está en libertad de calificar como práctica ilícita cualquier actuación de su propia iniciativa y hechura. Como más absurdo sería permitir que sea el patrono el que guíe y dirija hacia la J.R.T., a su conveniencia, una querella por práctica ilícita contra sí mismo.

Examinada la totalidad del expediente ante nuestra consideración, incluida la transcripción de la vista celebrada, así como los extensos y numerosos escritos sometidos por las partes, concluimos que la controversia entre el Plan y la A.A.A. no constituye una clásica disputa obrero-patronal *bona fide*. No toda controversia en que estén envueltos patronos y obreros constituye una disputa obrero-patronal, dentro del significado estatutario del término. Véase *P.R.T.C. v. Unión Indep. Emp. Telefónicos, supra; N.L.R.B. v. Internacional Longshoremen's Associtarion, supra; N.L.R.B. v. Miranda Fuel Co., supra.* Cuando se trata de intereses privados, nada impide que la parte afectada pueda recurrir a los tribunales a proteger dichos intereses. Véase *Asoc. de Guardianes v. Bull Line, supra.*

La acción del Plan corresponde a una reclamación por el incumplimiento claro de un contrato donde la A.A. A., cumplida ciertas condiciones convenidas por el Plan, se comprometió a pagarle a partir del 1 de junio de 2005 las aportaciones mensuales en beneficio de los empleados cubiertos. De la prueba presentada y creída por el T.P.I. surge que el plan cumplió con someter a la Oficina del Comisionado de Seguros cierta información requerida; y que de la auditoría practicada por la Oficina del Comisionado de Seguros no surgió que el Plan estuviera en estado de insolvencia y en menoscabo financiero. Esta prueba no fue contradicha.

Por todo lo antes expuesto, son ineludibles las siguientes conclusiones adicionales:

La reclamación del Plan, por su naturaleza, puede instarse en los tribunales. No son aplicables a la controversia las disposiciones relacionadas con una *"disputa obrera"* establecidas, tanto en la Ley Núm. 130, *supra*, como en la Ley Núm. 50, *supra*. No estamos ante una solicitud de interdicto para que se le prohíba a la A.A.A. pagar los beneficios del plan, Artículo 8(1)(k) de la Ley Núm. 50, *supra*. Tampoco estamos ante una solicitud interdictal para evitar actos de fraude, violencia o una conspiración ilegal por parte de una organización obrera, Artículo 5 de la Ley Núm. 50, *supra*.

De otro lado, no se ha planteado que la J.R.T. tenga ante sí una querella por práctica ilícita presentada por la U.I.A., por motivo de la denegatoria de la A.A.A. de hacer las aportaciones al plan médico. AUn cuando la U.I. A. inste querella a esos efectos, el Plan tiene una causa de acción independiente ante los tribunales en cobro de lo adeudado por la A.A.A.

El primero y segundo error señalados, no se cometieron.

-B-

Veamos ahora si el interdicto dictado se hizo conforme a derecho y en el ejercicio discrecional, razonable y discernido del T.P.I.

De la prueba presentada ante el T.P.I. surge que el Plan probó, a satisfacción de dicho foro: (1) la naturaleza de los daños que pueden ocasionársele de denegarse el interdicto; que dado el hecho de que el Plan no cobre cuanto antes lo que le adeuda a la A.A.A., su situación financiera puede colapsar irreparablemente; que de no concederse lo solicitado de inmediato y de tramitarse la reclamación por la vía ordinaria, ante el colapso financiero de la entidad, la causa de acción contra la A.A.A. podría tornarse académica; que a la luz del derecho

aplicable, el Plan tiene probabilidad de prevalecer en el litigio; y que el posible impacto sobre los servicios de salud que deben recibir los miembros de la unión afiliados al Plan sería evidentemente perjudicial.

La A.A.A. da énfasis en su petición y en los escritos complementarios a la misma a lo siguiente: que no tiene obligación contractual alguna con el Plan; que los unionados no corren peligro alguno de daño irreparable, porque tienen disponible otro plan médico sin costo alguno; y que tiene el deber de ejercitar sumo cuidado en el manejo de fondos públicos. Véase *"Réplica a 'Moción Urgente en Oposición a Solicitud de Auxilio de Jurisdicción y Oposición a Expedición del Auto de Certiorari'"* págs. 8, 13 y 14.

Si aceptáramos estos argumentos de la A.A.A., estaríamos permitiéndole que actúe en contra de sus propios actos. Véase *Corraliza Rodríguez v. Banco de Desarrollo, supra.* Nos explicamos.

La A.A.A. aceptó contractualmente que la U.I.A. contratara los servicios de un plan médico autorizado por la Oficina del Comisionado de Seguros; que los unionados seleccionaran libremente el plan de la U.I.A. o el plan médico de la S.S.S.; y que si el Plan cumplía con los requerimientos de la Oficina del Comisionado de Seguros y ésta certificaba la solvencia financiera del Plan y la ausencia de menoscabo en sus finanzas, se harían las aportaciones pendientes desde el 1 de junio de 2005. El Plan cumplió con su parte y la A.A.A. pretende evadir cumplir con la suya.

Como antes señalado, en nuestro ordenamiento de obligaciones y contratos, incluidos los convenios colectivos y los acuerdos derivados de los mismos, es principio magno que las obligaciones que nacen de los contratos tiene fuerza de ley entre las partes. Artículo 144 del Código Civil, *supra.* Véase también *Álvarez de Choudens v. Rivera, supra; Bauzá v. García López, supra; Corp. P.R. Dif. Pub. V. U.G.T., supra; Vélez Miranda v. Servicios Legales de Puerto Rico, supra; J.R.T. v. Junta Adm. Muelle Mun. de Ponce, supra.*

Además, es un principio reiterado que en la contratación la buena fe se presume. *Citibank v. Dependable Ins. Co., supra.*

Habiéndose garantizado en los acuerdos la libertad de los empleados unionados de seleccionar el plan médico de su preferencia, ese derecho debe ser respetado y no redefinido o reorientado hacia otro plan médico.

Como apuntáramos anteriormente, de dejar en estos momentos que la reclamación monetaria del Plan contra la A.A.A. se conduzca por la vía procesal ordinaria, sería exponer a miles de empleados públicos y a sus familias a una situación difícil de enfrentar. Así lo enfocó el T.P.I., al acoger la solicitud para encausar el asunto por la vía extraordinaria.

En cuanto al alegado deber de la A.A.A. de ser cuidadosa en el manejo de los fondos públicos, escapa a dicha argumentación que es serio deber en el manejo de dichos fondos cumplir con las obligaciones contraídas; y que, además, la fiscalización de los fondos que recibe el Plan por las aportaciones del patrono, le corresponde por ley a la Oficina del Comisionado de Puerto Rico, quien según las propias manifestaciones de la A.A.A. lo está haciendo. ■

El tercer error señalado, tampoco se cometió.

### -C-

Arguye la A.A.A. que el T.P.I. incidió en no darle cumplimiento al debido proceso de ley en la tramitación del litigio. No le asiste la razón.

Del expediente sometido por las partes se desprende que el T.P.I. notificó adecuadamente a la A.A.A. y a la U.I.A. de la vista señalada para ventilar la petición de interdicto. De la transcripción de la vista aparece que la

representación legal de la A.A.A. asistió preparada y que no solicitó la citación de testigos a su favor. Presentó todos los planteamientos y argumentos que entendió procedentes para defender a su cliente. Contrainterrogó ampliamente la prueba testifical presentada por el Plan. Y, con conocimiento de su caso, argumentó *in extenso* todos los fundamentos que entendió debía llevar al tribunal para oponerse a lo solicitado.

Ante este cuadro, no vemos razón alguna que nos mueva a concluir que la A.A.A. no tuvo un debido proceso de ley ante el T.P.I.

Tampoco se incidió en el cuarto error señalado.

## -D-

El caso ante nuestra consideración requirió en instancia la presentación de prueba testifical. Basándose en la misma, el T.P.I. concluyó que procedía dictar la orden interdictal solicitada.

Como expusiéramos anteriormente, en nuestro ordenamiento impera la norma de que un tribunal apelativo no intervendrá con las determinaciones de hechos ni con la credibilidad que adjudique a los testigos un tribunal de instancia, salvo que haya mediado pasión, perjuicio, parcialidad u error manifiesto. Véase *Álvarez de Choudens v. Rivera, supra.*

Tampoco debemos intervenir con las determinaciones interlocutorias procesales que haga el foro primario, salvo que haya incurrido en arbitrariedad o sea un claro abuso de discreción. Véase *García Rubiera v. Asoc. de Suscripción Conjunta, supra.*

No hemos encontrado nada en los autos ante nuestra consideración que justifique nuestra intervención en la apreciación de la prueba; o que sea demostrativo de que el T.P.I. incidió en arbitrariedad o abusó de su discreción al atender y disponer del asunto planteado.

## -E-

Hay controversias que por su naturaleza están revestidas de intereses apremiantes que impactan la vida de nuestra gente, y como tal están a la vista del escrutinio público. En el presente caso se recoge una de esas controversias.

Si permitiéramos que una parte contractual determine a su arbitrio cuándo y cómo cumple, o no cumple, con las obligaciones contraídas, estaríamos permitiendo que se viole la norma jurídica de que el cumplimiento de los contratos no puede quedar a merced de una de las partes. Artículo 1208 del Código Civil, *supra.*

La anarquía no puede tener cabida en el cumplimiento de las obligaciones. En el agitado Puerto Rico en que vivimos, en ocasiones dentro de la administración pública, es de suma importancia que tanto el Estado y sus instrumentalidades, así como los que interactúan con éstos en la misión de servir al pueblo, honren las normas y principios anteriormente esbozados.

Como sentenció el eminente Roscoe Pound, en uno de sus libros: "*Los hombres han de cumplir sus compromisos. Se trata de un supuesto básico de la vida civilizada.*" ■

## VII
## DISPOSICIÓN DEL RECURSO

Por los fundamentos anteriormente expuestos, se expide el auto solicitado y se confirma la Resolución de la cual se recurre, dictada el pasado 9 de noviembre de 2005, por la Sala Superior de San Juan del Tribunal de Primera Instancia. En consecuencia, se deniega la moción en auxilio de jurisdicción presentada por la parte

peticionaria.

Notifíquese de inmediato por la vía ordinaria y adelántese por teléfono.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Laura M. Vélez Vélez
Secretaria del Tribunal de Apelaciones